UNITED STATES of America

v.

Joe C. MUNFORD and Donald E. Belle.

Crim. No. 76–260.

United States District Court,
E. D. Pennsylvania.

April 21, 1977.

Jeffrey M. Miller (former Asst. U. S. Atty.), Douglas B. Richardson, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

David R. Morrison, Philadelphia, Pa., Victor Sherman, Beverly Hills, Cal., for defendants.

## OPINION

DITTER, District Judge.

Defendants were convicted by a jury of conspiracy and the illegal possession of 60 ounces of heroin. They seek judgment of acquittal or a new trial asserting their motions to suppress evidence were improperly denied, a violation of Sixth Amendment rights, prosecutorial misconduct, errors in the jury charge, and that the evidence was insufficient to sustain their convictions. For the reasons which follow, defendants' motions will be denied.

### 1. *The Factual Background*

On April 30, 1976, at approximately 3:00 P.M., Agent Walter Wasyluk of the Bureau of Alcohol, Tobacco, and Firearms, while on official business at the Hilton Inn Hotel in Trevose, near Bristol, Pennsylvania, observed the defendants, Joe C. Munford and Donald Belle, both Negro males, arrive in a late model Lincoln Continental Mark IV with a California license plate. Based upon the defendants' appearances, the time and day of the week, and the California plates, Agent Wasyluk decided to run a check on the vehicle's registration. After receiving information that the vehicle was owned by Edward Keefe O'Neil, 1811 *Carmona* Avenue, Los Angeles, California, Agent Wasyluk contacted Agent William Kean of the Drug Enforcement Agency (DEA) and told him what he had seen and learned. Wasyluk then began surveillance of the car.

Agent Kean checked his files and discovered that in July and October, 1974, a confidential informant had stated that Edward Keefe O'Neil, whose address was said to be 1811 South *Carolina* Avenue, Los Angeles, California, was a major drug trafficker who periodically came to the East Coast, and specifically with large quantities of Mexican heroin concealed in a compartment near the frame of his late model Cadillac. O'Neil was described as a Negro male, approximately 40 to 42 years of age, who weighed about 210 pounds. This data had come from an individual who had also supplied Agent Kean with information that had led to the arrest and conviction of seven persons for drug violations. Agent Kean thought the informant to be very reliable.

Based upon the information then in his possession, Agent Kean suspected that one of the defendants was Edward Keefe O'Neil [1] and that he was bringing heroin to the Bristol area. Agent Kean asked Wasyluk to continue surveillance. Kean and other agents then made their way to the Hilton, arriving there at about 5:30 P.M. Approximately one hour later, Belle came out of the hotel with an unidentified female and entered the Lincoln. He drove the woman to the other end of the parking lot where she entered another automobile and in it lead Belle back toward the immediate vicinity of the hotel. She pointed to a parking space under the window of Room No. 308, the number of the room that had been registered to Munford, and Belle then parked the Lincoln there and reentered the hotel. The female drove away.

At approximately 7:30 P.M. the defendants came out of the hotel, entered the Lincoln, circled the parking lot one and one-half times, and then headed to a nearby Krispie Kreme Donut shop, located on Route 1, a major traffic artery. Belle got out of the car, walked toward Route 1, and waved to a 1973 silver Cadillac which was parked on the other side of the highway. He then reentered the Lincoln and the defendants drove off, followed by the Cadillac. The two vehicles negotiated a series of turns, leading Kean to believe that the Cadillac was following the Lincoln in which Munford and Belle were riding. Finally, both vehicles entered Buffalo Avenue, a small residential street not far from the Hilton Inn Hotel. The Lincoln turned into the driveway of a residence subsequently identified as 2606 Buffalo Avenue. Belle got out of the Lincoln and into the passenger side of the Cadillac, which was still in the street. The Cadillac then left Buffalo Avenue and headed toward Old Lincoln Highway, another major traffic artery, followed by a surveillance unit under Kean's radio directions.

Having seen the Cadillac's license plate, Kean recognized the vehicle to be one he had previously observed in connection with another drug case. He knew that the car was registered to a man named O'Neil Roberts of Philadelphia. From prior information, Agent Kean also knew that during a narcotic's transaction Roberts had been shot in the back and left partially paralyzed. The license plate on the Cadillac bore the letters "HP," indicating that it was registered to a handicapped person. During his previous investigation of Roberts, Kean had been told that Roberts was involved in the drug traffic in the Philadelphia area and that, periodically, he bought narcotics from persons who came from Los Angeles, California.

After Roberts' silver Cadillac, with Belle as a passenger, left Buffalo Avenue, Kean observed Munford at the right front of the Lincoln which had its hood up. He appeared to be bending over the engine and doing work on it, although he was not in work clothes. Thereafter Kean observed him retrieving from the engine area dangling parcels, silver in color and a little bit larger than a shotgun shell, which were tied together by a string. There were many of these packets and he believed that they contained heroin. Kean instructed the surveillance unit following the Cadillac to stop it and learn the identity of its occupants.

The Cadillac was halted on Old Lincoln Highway by DEA Agent Dennis H. Malloy. Belle, who was a passenger in the Cadillac, was ordered to get out. He was asked his name, frisked, handcuffed, and moved toward the rear of the vehicle. The driver, a handicapped individual, was identified as O'Neil Roberts. At that point there were only two agents present, but they were joined shortly thereafter by Wasyluk and two agents from the Bureau of Alcohol, Tobacco, and Firearms. When Kean was told that Roberts was the driver of the Cadillac, he instructed the agents to bring

---

1. At trial, I observed that both defendants were mature men and affidavits executed in connection with their application for bail revealed that they were 34 and 36 years of age. Obviously, Agent Kean's belief that one of them was Edward Keefe O'Neil was a reasonable conclusion under all of the circumstances.

both men back to Buffalo Avenue. Upon the return of the agents with Belle and Roberts, Agents Kean, Hopson, and Wasyluk went down the driveway and detained Munford who was still near the Lincoln. As Agent Wasyluk approached the car, he noticed its front door was open. He looked inside to ascertain whether or not anyone else was there and, in doing so, saw an open shopping bag on the floor of the front, passenger side. In it he could see packets covered with silver tape and tied together with strings. Subsequently it was shown that these packets contained heroin.

The defendants were arrested and given their *Miranda* warnings. In addition, another individual, Burton Mayfield, who was at the Buffalo Avenue residence, was arrested. While Agent Kean was advising Mayfield of his constitutional rights, Munford stated that he, Mayfield, did not have anything to do with it, that it was "my stuff" (N.T. 85, First day). Later, Munford told Kean that he believed there were "60 pieces" and that the "stuff" was selling for about $750. an ounce in California but would sell for approximately $1500. an ounce in Philadelphia (N.S. H. 166).[2] Later at a local police station, Munford was again given his *Miranda* warnings and in response to questions said that he had come from California to deliver dope in the Bristol area, just as he had done on prior occasions (N.T. 46, Second day). See note 10, infra.

Following his arrest, Belle was also warned of his constitutional rights and in response to a question from Agent Wasyluk stated

. . . that he had come to this area with Mr. Munford and that they were driving down a road when this gentleman, who was later identified as O'Neil Roberts, beckoned to them from his car for Mr. Belle to come over. Mr. Belle stated that Mr. Roberts asked him whether or not he would be willing to ride with him to a store so that Mr. Belle could run in and get something for him. (N.T. 85, Second day).

When Wasyluk indicated his disbelief of Belle's description of what had transpired, particularly because Belle would not know where he was going or how he was going to get back, Belle replied, "Well, that's my story" (N.T. 89–90, Second day).

## 2. *The Court's Denial of Defendants' Motion to Suppress*

Defendants' first contention is that I erred in denying their pre-trial motions to suppress certain evidence and statements. Since this assertion is multi-faceted, I shall consider each argument separately.

### (a) *Reasonable Suspicion to Detain Defendants*

Defendants argue that up to the point the heroin was found they had been illegally detained because the agents did not have the requisite reasonable suspicion. For support, they contend that there were no distinct facts which could have led a reasonable man to believe any criminal activity had or was about to take place, and that the agents placed unwarranted, impermissible reliance on unverified information supplied by an informant.

As the Supreme Court stated in *Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), however,

The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* [*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] recognizes that it may be the essence of good police work to adopt an intermediate response . . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

---

**2.** This statement was not repeated at trial.

To justify a particular intrusion on another's freedom, the officers must be able to point to specific facts, not inarticulate hunches, which, taken together with rational inferences from those facts, reasonably warrant that intrusion. *Terry v. Ohio,* supra, 392 U.S. at 21, 88 S.Ct. at 1880. Such justification has been expressly limited to those circumstances where the action is supported by a reasonable suspicion. *United States v. Brignoni-Ponce,* 422· U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

■ Defendants discussed at length the reliability and underlying circumstances tests delineated in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), where the knowledge supplied by an informant was the basis for an arrest or search warrant. These cases are not applicable for in no way could it be contended that the data from informants was the sole basis of the detention, search, seizure, or arrest of Munford and Belle.[3] While the facts furnished by the informants may have been the backdrop which caused the agents to put the defendants under surveillance and which made it obvious to the agents that defendants were engaged in unlawful conduct, the agents acted on the basis of what they had seen as well as what they had been told.

■ Combining it all, the agents knew that Belle and Munford were in the Bristol area driving a California automobile registered to a man whose name and Los Angeles address linked him to sales of heroin brought to the Bristol area from Los Angeles in the secret compartment of an automobile. Physically, Belle was much like this man. There was an obvious rendezvous and exchange of signals with a car whose handicapped owner was said to be a purchaser of drugs brought to the east coast by someone from Los Angeles. The

car of the suspected "buyer" followed the car of the suspected "seller" to a private area at which point one of the Californians entered the car of the "buyer" and drove away with him while the other Californian immediately began to remove packets of what the agents thought was heroin from a concealed compartment of the automobile. These actions would suggest to almost anyone—and certainly to trained agents—that preparations for delivery of drugs were being completed. In these circumstances, it was the agents privilege, indeed their responsibility, to detain the defendants. *United States v. Fields,* 458 F.2d 1194, 1197 (3d Cir. 1972), cert. denied 412 U.S. 927, 93 S.Ct. 2755, 37 L.Ed.2d 154 (1973). There was ample probable cause.

### (b) *Belle's Post-Arrest Statement*

Defendant Belle asserts that even if there was probable cause to detain him, the actions of the agents in frisking and handcuffing him went beyond the limits of mere detention and developed into a full-scale arrest, which was not supported by probable cause, thereby rendering his arrest illegal and requiring that his statement stemming therefrom be suppressed.

■ In *Terry v. Ohio,* supra, the Court recognized that an officer making an investigatory stop should not be denied the opportunity to protect himself from a hostile suspect, and may therefore conduct a limited protective search for concealed weapons. The purpose of this search is not to discover evidence of the crime, but to allow the officer or agent to pursue his investigation without fear of violence. Therefore, the agent was warranted in asking Belle to alight from the vehicle and in frisking him.

■ Handcuffing Belle and returning him to the Buffalo Avenue location was a means of maintaining the status quo and preventing Belle's escape. It would be frivolous to hold that the right to detain recog-

---

**3.** If the *Aguilar* tests were applicable, the informant would have been considered reliable (he had previously supplied information leading to the arrest and conviction of seven persons on drug charges) and his information valid because of the wealth of detail supplied including

O'Neil's name, address, physical description, date of arrival in the area, amount of drugs possessed, source of drugs, year, make, and registration number of automobile, price of drugs, description of drugs' quality, etc.

nized in *Terry* requires all the parties to remain at the very spot where the seizure of the person took place. Belle was stopped at dusk on a Friday evening in the middle of a major highway. For his own safety, that of the agents, and the motoring public, the cars and their occupants had to be taken somewhere. Returning him to Buffalo Avenue was both logical and reasonable since it was only a short distance away and was the scene of the suspected criminal activity.[4]

██ Precisely when an arrest has occurred is a question of fact which depends upon an evaluation of all the surrounding circumstances. *Peters v. New York*, 392 U.S. 40, 67, 88 S.Ct. 1889, 1912, 20 L.Ed.2d 917 (1968). Here, it is not necessary to decide when Belle was actually arrested for even if I were to hold that the agent's conduct after the Cadillac was stopped amounted to an illegal arrest, suppression of Belle's statement would not be warranted. Once it was determined that the packets contained heroin, the agents clearly possessed probable cause to arrest Belle. It was only after he was formally arrested and given the *Miranda* warnings that he gave the statement at issue. Belle cannot argue that it resulted from the "first" arrest and therefore the statement was properly received in evidence.

### (c) *The Search of the Lincoln*

Defendants' third contention is that the search conducted on the Lincoln exceeded the permissible scope of a search incident to an investigatory stop and that there were insufficient exigent circumstances to justify a warrantless search of the vehicle. Therefore, they sought exclusion at trial of the evidence derived from the search.

██ A basic constitutional rule is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-deline-

ated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Among the exceptions are those where an officer seizes evidence which is in plain view.

The Fourth Amendment shields a citizen from unwarranted invasions of his privacy. What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).

Here, defendants argue that the discovery of the heroin in the open shopping bag was not inadvertent but the facts related convinced me to hold otherwise. Agent Wasyluk, who first saw the bag and its silver packets, had not observed Munford removing them from their hiding place. Rather, Wasyluk was one of the officers who had brought Belle back to Buffalo Avenue. On arrival, Wasyluk got out of the car and started down the drive toward Munford who was close to the Lincoln. Its door was open and Wasyluk looked into the vehicle to see if anyone was there. On the floor at the front of the passenger's seat, he saw the open shopping bag and its contents. This occurred while Agent Kean was pursuing another suspect. When Kean returned, Wasyluk told him about the bag and its parcels and both men looked at them. Having seen these objects being pulled from the car by Munford, Agent Kean then arrested him.

██ As I have noted before, *Terry v. Ohio* gives an officer the right to protect

---

4. Munford also argues that his detention amounted to an illegal arrest, but it is evident that this contention is without merit, since the agents had probable cause to detain him and his detention was brief.

himself from possible attack, and for this reason, I concluded that Wasyluk was acting properly and had a legitimate reason for looking into the vehicle and, therefore, that the plain view doctrine justified the seizing of the heroin.

Moreover, sufficient exigent circumstances were also present to justify the warrantless search of the Lincoln.

■ If an officer has probable cause, he may search without a warrant for contraband concealed and illegally transported in a motor vehicle because the car's mobility may make the obtaining of a warrant impracticable. *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925).

In *Chambers v. Maroney*, 399 U.S. 42, 51–52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970), the Supreme Court pointed out

. . . if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search. . . . For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

*Chambers* dealt with a vehicle stopped on a public highway. The defendants argue that the present situation is more like that found in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), where the court overturned a warrantless search of a vehicle that was on private property. However, *Coolidge* does not turn on the difference between searches of vehicles on a highway and those on private property, but on whether there are exigent circumstances or not.

In *Coolidge* the police had known for some time of the probable role played by defendant's car in the crime. *Coolidge* was aware he was a suspect and had had ample opportunity to destroy any evidence he thought to be incriminating. He was arrested inside his home by two officers and the other occupants were removed from the residence. The car was towed to a police garage where it was carefully searched. Under these circumstances, it was appropriate for the court to hold inapplicable the rule of *Carroll* for there was

. . . no alerted criminal bent on flight, no fleeting opportunity on an open highway after hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized automobile. In short, by no possible stretch of the legal imagination can this be made into a case where "it is not practicable to secure a warrant," [citing *Carroll*]. Id., 403 U.S. at 462–63, 91 S.Ct. at 2035–36.

It is clear the present case falls within the ambit of *Chambers v. Maroney*, supra. Given the speed with which the events had unfolded to that point, it would have been highly impracticable to secure a warrant. Despite the fact that Munford and Belle had been detained, the agents were faced with the possibility that the suspected contraband, which was not only incriminating but which had a high dollar value, might be retrieved by someone else. The risk of interference was greater than if the Lincoln had been stopped on a highway. As the officers knew, Munford had driven to this residence and obviously felt it to be a safe place because he immediately began to take the heroin from beneath the Lincoln's hood. The agents knew of the woman who had been observed with Belle at the motel. She had a car and had given some directions to Belle. For all the officers knew, there may have been a variety of confederates watching from the house or on call nearby, some or all of whom may have been armed.

■ Of course, whether or not there were persons in the residence awaiting the

defendants and whether or not they would have attempted to move the Lincoln, or remove the valuable and incriminating evidence, is a question which calls for speculation, but is relevant in determining whether the agents acted reasonably or not. Considering all the possibilities and unknowns, the warrantless search of the Lincoln was proper.

Adequate evidence was presented at the suppression hearing to justify the initial detentions of the Lincoln, the seizure of the contraband, and the subsequent arrest of defendants. Defendants do not contest the sufficiency of the warnings given to them. Therefore, I reject defendants' contention that the heroin and their statements should have been excluded from use at trial.

### 3. Defendants' Motion for Judgment of Acquittal

In considering a motion for judgment of acquittal, the pertinent question is "whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Phifer*, 400 F.Supp. 719, 724 (E.D.Pa. 1975), aff'd 532 F.2d 748 (3d Cir. 1976), quoting *Curley v. United States*, 81 U.S. App.D.C. 389, 160 F.2d 229, 232-33 (1947). It is not my function to weigh the evidence or determine credibility, 2 *Wright & Miller, Federal Practice and Procedure Criminal*, § 467, at 259; rather, the jury's verdict must be sustained if, after considering the evidence in a light most favorable to the government, there is substantial evidence supporting the verdict. *United States v. Trotter*, 529 F.2d 806 (3d Cir. 1976). Applying these tests, I conclude that there was sufficient evidence for the jury to find defendants guilty beyond a reasonable doubt, as to both the conspiracy and possession counts.

### (a) The Conspiracy Count (Count I)

While the primary requirement for the establishment of a conspiracy is the demonstration of an agreement, *United States v. Perez*, 489 F.2d 51 (5th Cir. 1973), cert. denied 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974), "no formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose." *American Tobacco Co. v. United States*, 328 U.S. 781, 809-10, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). Proof of knowledge on the part of a participant in an alleged conspiracy is also an essential element, *United States v. Annoreno*, 460 F.2d 1303, 1309 (7th Cir.), cert. denied 409 U.S. 852, 93 S.Ct. 64, 34 L.Ed.2d 95 (1972), as well as showing an intent to agree to do a wrongful act. *United States v. Tyler*, 505 F.2d 1329, 1332 (5th Cir. 1975). Defendants argue that the government's evidence that Belle accompanied Munford across the country and was in Munford's company near the time the narcotics were found simply was insufficient to demonstrate knowledge of their presence, and even if it was, there was no showing that Belle intended to join and cooperate in the illegal venture.[5] In making this argument, however, defendants conveniently ignore the great body of circumstantial evidence upon which the jury could have reasonably relied in making its decision.

For example, the government also demonstrated that Edward O'Neil had given *both* Belle and Munford written permission to use the Lincoln and produced hotel records which showed that two telephone calls had been placed within twenty minutes of defendants' arrival. One call had been made to California, the other to a Willingboro, New Jersey, number listed in the name of O'Neil Roberts. It was reasonable for the jury to conclude from the telephone call and the fact that it was Belle who

**5.** Obviously, a conspiracy is a combination of two or more persons, and if the jury was incorrect in concluding that Belle had conspired with Munford, then Munford could not have been found guilty of conspiracy either.

signaled to Roberts that Belle was aware of what was going on and was a willing participant. From the fact that Belle drove away from Buffalo Avenue with Roberts, who had $1300. in his pocket at the time he was taken into custody, while Munford immediately set about removing the heroin from its hiding place, the jury could have inferred that it was Belle's responsibility to be sure Roberts would not be in a position to watch Munford and learn exactly where the drug was concealed or the quantity on hand. Belle's post-arrest statement could have been considered by the jury to negate any inference of innocent conduct on his part.

. . . Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful agreement, the conclusion that a conspiracy is established is justified. *American Tobacco Co. v. United States*, supra, 328 U.S. at 809–10, 66 S.Ct. at 1139.

Taking into account all of the evidence adduced at trial, I cannot hold that the jurors were not warranted in finding a conspiracy or that they must have had a reasonable doubt that Belle was a knowing participant. The verdict as to the conspiracy count must be sustained.

### (b) *The Possession Count (Count 2)*

Defendant Belle also asserts that there was insufficient evidence presented at trial to uphold his conviction of possession.[6]

Possession of a narcotic drug may be established by circumstantial evidence. . . . The evidence must be such, however, that a jury may infer that the person charged with possession had dominion and control of the narcotic drug, or that he knowingly had power to exer-

cise dominion and control over the drug. Such dominion and control need not be exclusive but may be shared with others. On the other hand mere proximity to the drug, or mere presence on the property where it is located or mere association with the person who does control the drug or the property is insufficient to support a finding of possession [citations omitted]. *United States v. Davis*, 461 F.2d 1026, 1035–36 (3d Cir. 1972).

Here, the government's case was based upon the theory of constructive possession since Belle was not shown to have had the heroin in his hands as was Munford. However, the drug obviously had been in the car and so had Belle. There had been a cross-country journey, from which the jury could infer that Belle drove the vehicle some of the time and exercised dominion over it and its contents. There was at least one point, when Belle repositioned the vehicle under the window of Room 308, that he had sole control over the automobile and the heroin.[7] Given these circumstances and the other evidence produced at trial, especially the quantity and potential value of the drug, the jury could have properly concluded that this was a two-man mission and that Belle was the second man.

It is plain that the government's evidence provided the jury with a sufficient basis for guilty verdicts. Direct evidence was presented as to Munford's guilt and substantial circumstantial evidence to support the finding of conspiracy and possession as to Belle. Therefore, defendants' motion for judgment of acquittal based on insufficiency of evidence must be denied.

### 4. *The Charge to the Jury*

Defendants also assert that this court's charge to the jury commented unfairly on the evidence and impermissibly advocated the case for the government to

---

6. Munford does not contest his conviction on this ground, since there was, without doubt, adequate direct evidence concerning his possession of the heroin.

7. Of course, if Belle did not know the drug was in the car, he could not have been guilty of *knowing* possession. As previously observed, however, there was ample evidence from which

their prejudice.[8] This broad claim is supported neither by specific allegations of improper conduct nor by any showing of prejudice to the defendants and I find it to be without merit.

■ The power of the trial judge to comment on the evidence and witnesses in his instructions to the jury is not without limitations.

> . . . His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standard governing the judicial office. In commenting on the evidence he may not assume the role of a witness. He may analyze and dissect the evidence, but he may not distort it or add to it. *Quercia v. United States*, 289 U.S. 466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933).

However, when the government has presented most or all of the evidence and defendants do not put on a defense, any summary of the evidence naturally will devote more time to the prosecution's case. Moreover, I had told the jurors that the weight to be afforded to the testimony was for them to decide. (N.T. 5, First day, 194–195, 201–202, 210–211, 231, 233). Although defendants argue that the emphasis given was too harmful to be cured by any other instructions, an examination of that part of the record referred to by defendants fails to convince me that the summary was anything but impartial. For these reasons, defendants' challenge to the court's charge must be dismissed.

### 5. The Allegations of Prosecutorial Misconduct

Defendants' next two contentions of error stem from certain comments made by the Assistant United States Attorney during his closing argument. To be assessed, these contentions must be placed in their proper perspective.

■ While he was addressing the jury, the prosecutor made three statements [9] which defendants argue amount to an expression of personal opinion as to the credibility of the defendants and their guilt. It is clearly unprofessional conduct for a prosecutor to express his personal belief or opinion as to the truth or falsity of testimony or evidence of a defendant's guilt, Code of Professional Responsibility, Ethical Consideration 7–24; Local Rule of Criminal Procedure No. 2, United States District Court for the Eastern District of Pennsylvania, but it is equally clear that these statements represent nothing more than the vigorous advocacy of conclusions the jury could adopt from the evidence presented. He was not encouraging the jurors to substitute his judgment for theirs. Moreover, to permit review, defendants must show that plain error was committed since they failed to object to these statements at trial. *United States v. Cook*, 505 F.2d 659, 663 (5th Cir. 1974), cert. denied 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667 (1975). An examination of the record discloses nothing that would constitute plain error.

---

it could be concluded that Belle was fully aware of the heroin's presence.

**8.** Defendants chose not to put on any evidence in their behalf.

**9.** The Assistant United States Attorney stated as to defendant Munford:

> You can consider what the agents saw, the analysis of the heroin and Munford's statement. Munford's statement is part of the evidence. *I submit to you that there is no doubt whatsoever with respect to Munford's guilt.* (N.T. 143, Second day) (emphasis added).

In commenting on Belle's statement, he related:

> Obviously, when he is set upon by a federal agent he knows his goose is cooked, he's got to say something, so he says something that's completely ridiculous. *It's a false exculpatory statement which shows consciousness of guilt. Obviously it was a lie* . . . (N.T. 145, Second day) (emphasis supplied).

The final statement referred to is one made when the prosecutor ended his rebuttal argument.

> . . . Please consider the evidence. Consider it fairly for the government, consider it fairly for the defendants—*and I submit to you I think you will find that the evidence demonstrates that both are guilty.* (N.T. 187, Second day) (emphasis supplied).

The defendants' second assertion of prosecutorial misconduct is that the assistant United States attorney appealed to the passions and prejudice of the jury through his repeated references to the quantity and value of the heroin. While recognizing that some latitude is allowed in commenting on the social consequences of a crime, they argue that the prosecutor overstepped the bounds of permissible comment when he brought out evidence of how many dosages could be had out of the 60 ounces of heroin and that defendants would have made a profit of $45,000. if the heroin had been sold.

■■■■ A prosecutor's argument must be viewed as a whole to see if it was unduly prejudicial. He is not restricted to a sterile recitation of the facts. *United States v. Greene*, 497 F.2d 1068, 1084–85 (7th Cir. 1974), cert. denied 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975). He may be an advocate, *Homan v. United States*, 279 F.2d 767 (8th Cir.), cert. denied 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88 (1960), and his blows may be hard so long as they are not foul. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). A review of the record demonstrates that there was no misconduct by the prosecutor; rather, each reference to the quantity and value of the heroin was used to buttress an inference that could be drawn from the other evidence. In particular, it was offered to support the government's theories that the narcotics were intended for distribution (N.T. 129–131), that it was necessary to move the car under the window of defendants' hotel room because of the heroin's value (N.T. 137), and that the quantity and

value necessitated immediate telephone calls to California and their contact, O'Neil Roberts.

■■■■ The Court of Appeals has observed that trials are rarely, if ever, perfect, and that improprieties in counsel's closing argument warrant a new trial only if they are so gross as probably to prejudice the defendants and the prejudice has not been neutralized by the court before submission of the case to the jury. *United States v. Homer*, 545 F.2d 864, 868 (3d Cir. 1976). Any harm from prosecutorial argument must have affected a substantial right of the defendants, and the prejudice must be balanced against the evidence of guilt. *United States v. Cook*, supra, 505 F.2d at 664. Here, there was no misconduct or prejudice that affected any substantial rights of the defendants.

### 6. The Alleged Violation of Belle's Sixth Amendment Rights

Another assertion of error involves my refusal to grant defendant Belle's motion for mistrial, which was based on an alleged violation of his Sixth Amendment right to confrontation. At trial, I permitted into evidence Agent Hopson's summary [10] of the statement given by Munford to Hopson at the Bensalem Township Police Department offices following his arrest. Defense counsel then moved for mistrial, asserting that this statement obviously implicated Belle,[11] who had been in Roberts' Cadillac when arrested, and thus constituted a violation of his right to confrontation, as enunciated in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The motion was denied, but I did give the jury

---

10. Agent Hopson related as follows:

Mr. Munford stated that he had come from California and that he was going to deliver the heroin between 8:00 and 8:30 P.M. that evening of April 30th to a trash can located near the Krispy Kreme Donut Shop at Route 1 and Old Lincoln Highway.

He further stated that approximately two or three times in the past he had transported heroin into the same area and on two occasions *had met with* O'Neil Roberts. (N.T. 46, Second day) (emphasis supplied).

11. According to Belle's counsel at trial, a similar summary of this statement had been given to him by the government through pre-trial discovery. But, he contended, this summary did not contain any reference to O'Neil Roberts and for that reason he had not raised the *Bruton* argument prior to Agent Hopson's testimony. In fact, the report executed by Hopson did not mention that Munford said he had met with Roberts, but Hopson did recall at trial (N.T. 53, Second day) that Munford had made such a statement.

instructions that the statement was to be considered as evidence solely against Munford. Defendant now advances the same grounds to support his charge of error, but I find his argument must fail for two reasons.

First of all, in *Bruton*, the Supreme Court held that the admission of a co-defendant's confession implicating the defendant was a violation of the defendant's right to cross-examine witnesses against him, even if it was admitted with a cautionary instruction to the jury that the statement was only to be considered as evidence against the co-defendant. But implicit within this ruling was the rationale that the statement represent a "powerfully incriminating extrajudicial statement" which is highly damaging to the defendant. *Bruton*, supra, 391 U.S. at 135–38, 88 S.Ct. at 1627–29. Here, Munford's statement included no reference whatsoever to Belle. There is the reference to prior contacts with Roberts,[12] but defendant's contention that this statement, coupled with Belle's detention while riding with Roberts, "obviously implicated" Belle in the transaction presents too attenuated an argument to satisfy *Bruton*.[13] Second, *Bruton* also implies that the statement be of critical, or at least substantial, weight to the government's case. *Bruton*, supra, 391 U.S. at 128, 88 S.Ct. at 1623. In this case, it is clear that when compared with the other evidence against Belle, the statement was of no import as to him. For these reasons, the denial of the mistrial motion was not in error.[14]

For all the reasons stated, I conclude that the defendants are not entitled to either a judgment of acquittal or a new trial.

---

12. In order to avoid an exercise in semantics, I agree with defendant that the "had met with" language could have been construed by the jury to mean that Munford had set up prior drug dealings with Roberts.

13. I also agree with the government that this argument directly contradicts defendant's prior assertion that guilt cannot be inferred from mere association.

14. It is not necessary to discuss defendants' final argument, that it was error to admit evidence of the $1300. found in the possession of Roberts and a new trial is warranted, other than to hold that defendants failed to show that error was committed or that a substantial right was affected by the admission. *United States v. Neff*, 343 F.Supp. 978, 980–81 (E.D.Pa.1972), aff'd 475 F.2d 861 (3d Cir.), cert. denied 412 U.S. 949, 93 S.Ct. 3007, 37 L.Ed.2d 1001 (1973).