**UNITED STATES of America, Appellee,**

**v.**

**Gaetano MODICA, Appellant.**

**No. 1025, Docket 80–1482.**

United States Court of Appeals, Second Circuit.

Argued April 7, 1981.

Decided Oct. 30, 1981.

Barry E. Schulman, Brooklyn, N. Y. (Edwin I. Schulman and Schulman & Laifer, Brooklyn, N. Y., of counsel), for appellant.

William J. Cunningham, III, Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Brooklyn, N. Y., Jane Simkin Smith, Asst. U. S. Atty., E.D.N.Y., New York City, of counsel), for appellee.

Before TIMBERS and NEWMAN, Circuit Judges, and SOFAER,* District Judge.

PER CURIAM:

This appeal—like far too many reaching this Court—centers on improper statements made by a prosecutor in his summation to a jury. Such misconduct has gone largely unremedied, for appellate courts are understandably reluctant to reverse convictions merely to discipline prosecutors. This case, too, is one in which the prosecutor's improper remarks do not warrant reversal of the conviction. The time has come, however, to explore possible sanctions for prosecutorial misconduct other than reversing convictions. We believe that alternative sanctions can and should be fashioned, and that an exploration of their use may prove to be more effective than the unheeded condemnations expressed in prior opinions.

I. *The Crime Alleged*

Appellant's indictment grew out of an unorthodox scheme to smuggle five kilograms of heroin into the United States through John F. Kennedy International Airport. On October 22, 1979, a brown, soft-sided, zippered suitcase arrived at the airport on an Alitalia Airlines flight from Rome. The suitcase carried no personal identification tag and no baggage claim-check; the only identifying feature was the brandmark "Airway." No one claimed the suitcase, and it was placed in the Alitalia section of the leftover baggage room at the airport, an area controlled by the United States Customs Service. On October 23, an Alitalia employee presented the suitcase to a customs agent; the agent examined the bag cursorily, found nothing, and cleared it. The bag was then moved to the Alitalia lost-and-found room. Later that day, another Alitalia employee, Finiello, searched the suitcase in order to identify and locate its owner. As he searched, two plastic bags fell out of a coat in the suitcase. Finiello correctly suspected that the bags contained heroin, and he so advised another employee

* Honorable Abraham D. Sofaer, United States District Judge, Southern District of New York, sitting by designation.

in the lost-and-found room, Miradoli, as well as the area supervisor. The Alitalia employees returned the suitcase to the left-over baggage room, where a customs inspector examined it and discovered three additional bags of heroin. In all, the suitcase contained five kilograms of heroin, with a wholesale value of $1.4 million.

The parties disagree as to what transpired between the time that the heroin was discovered and November 15, when appellant Gaetano Modica claimed the suitcase. The prosecution's account is that the suitcase remained unclaimed for about two weeks. Then, on the afternoon of November 12, appellant went to the Alitalia information desk at the airport and contacted an employee named Amato. Appellant gave Amato a note, dated November 1979, and written in Italian on Alitalia stationery. The note was from Morfino, an Alitalia employee apparently stationed in Palermo, Italy. The note asked Amato to assist Morfino's cousin, the bearer of the note. Appellant told Amato that he had arrived on an Alitalia flight from Rome on the previous day and had lost a suitcase. Amato accompanied appellant to the lost-and-found room to search for the bag, but Finiello told them that appellant would need to bring his baggage claim-check, and they left.

On the evening of November 12, appellant and Amato returned to the lost-and-found room. Appellant brought four baggage claim-checks. Miradoli, who had been present with Finiello on appellant's earlier visit, located a bag that matched one of the claim checks. Appellant signed for the bag and then left the room with Amato. Shortly thereafter, they returned, and Amato asked Miradoli to assist appellant on another problem. Amato then left the room, and appellant told Miradoli that he was looking for another bag—a brown, soft-sided, zippered suitcase. He claimed that his aunt had arrived on an October 22 Alitalia flight, but had been too ill to claim the suitcase.

Miradoli ascertained from the baggage records that two bags that had arrived on October 22—one black and one brown—had gone unclaimed. He mistakenly told appellant that the brown bag had been returned to Alitalia's lost-and-found department in Rome. Appellant then left the room. Later that day, however, Miradoli rechecked the records and discovered that the brown suitcase had not been returned to Rome; he then realized that appellant was looking for the suitcase that contained the heroin.

On November 15, appellant visited Amato at a travel agency for which Amato moonlighted; appellant had asked for Amato's business card on the twelfth and said that he might purchase airline tickets from Amato there. On the fifteenth, appellant did indeed purchase several tickets from Amato. Appellant again asked for help in locating the brown suitcase from the October 22 flight, and he said that he had determined that the bag had not been returned to Rome. (At trial, Amato was unable to recall the details of this conversation, and the prosecution introduced portions of his grand jury testimony.) Appellant described the suitcase as light brown and carrying no claim check. Appellant handed Amato a note on blue paper with "RWUY" written on it to describe the brandmark on the suitcase; Amato interpreted those letters to be a phonetic approximation of "Airway." Appellant told Amato that the suitcase contained something valuable and that someone might get in trouble if the bag were not found; he gave Amato his home telephone number and left.

When Amato arrived at work in the Alitalia terminal later that day, he was interviewed by Drug Enforcement Administration ("DEA") agents as a suspect in their investigation of the October 22 suitcase. After recounting his conversation with appellant, Amato was directed to phone appellant and inform him that his suitcase had been found.[1] Appellant returned Amato's

---

1. Amato called the Modica home twice. The first call was not answered; a woman answered the second call and took a message for appellant to call Amato back. At trial, the prosecutor told the court that a tape recording of that conversation had been made, but was missing. At appellant's request, the jury was read a stipulation that a recording of an Amato

call at 10:30 p. m., and Amato told him to come and claim the suitcase that evening. Appellant arrived around 11:00 p. m., and Amato led him to the hallway outside the lost-and-found room. DEA agents had lined up a half-dozen suitcases there; appellant looked the bags over, chose the October 22 suitcase, and departed with it. Under extensive surveillance, appellant drove to a restaurant and, after about two hours, returned to his home. DEA agents there arrested him and seized the suitcase from the trunk of his car.

The prosecution's theory of the crime was that appellant, working with confederates in Italy, had concocted this unusual scheme to smuggle the heroin past the customs agents. The perpetrators had deliberately removed all identification from the bag, hoping for a cursory inspection in the leftover baggage room. As soon as appellant arrived from Italy, he began his efforts to obtain the suitcase.

Appellant's defense was in essence that he had been framed by Amato. Appellant contended that Amato, probably in conjunction with other Alitalia employees, had planned to smuggle in the suitcase. When the heroin was discovered and Amato interrogated as a suspect, he needed to shift the blame onto someone else, and appellant unfortunately happened along at that time. Appellant was not seeking a suitcase from an October 22 flight, but rather was seeking a second lost bag from his November 11 flight. When Amato called appellant on November 15, he told appellant that he had located that second suitcase. At the air-

port, appellant claimed, Amato pointed to the suitcase and told appellant that he need not examine it because it was his. Thus, appellant unwittingly claimed the suitcase pursuant to Amato's scheme.

Appellant was indicted on three counts: attempting to possess with intent to distribute five kilograms of heroin, 21 U.S.C. §§ 841(a)(1), 846; possessing with intent to distribute thirty grams of heroin, 21 U.S.C. § 841(a)(1); and importing five kilograms of heroin into the United States, 21 U.S.C. §§ 952(a), 960(a)(1). On October 28, 1980, the jury convicted appellant of the first two counts and acquitted him of the third. The trial court sentenced appellant to ten years imprisonment and fifteen years special parole on each of the two counts, the sentences to run concurrently.

## II. *The Warrantless Search*

■ When the DEA agents arrested appellant in front of his house, they conducted a warrantless search of the trunk of his automobile and found the suitcase. Appellant moved below to suppress the suitcase, on the ground that the agents needed a warrant to enter the trunk. The district court properly denied appellant's motion. The agents knew that the automobile was carrying heroin, and they therefore had probable cause to believe that the automobile could be seized and forfeited pursuant to 49 U.S.C. § 782 and 21 U.S.C. § 881.[2] They were entitled to search the trunk without a warrant even though they did not seize the automobile. *United States v. Panebianco*, 543 F.2d 447, 456 (2d Cir. 1976),

telephone conversation had been made but was missing. Appellant did not assert any prejudice or request an additional remedy. Appellant now claims, however, that the missing tape would have supported his theory that Amato framed him. Citing *United States v. Buffalino*, 576 F.2d 446 (2d Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978), appellant urges that his conviction be overturned and the indictment dismissed.

Appellant's claim is baseless. He and Amato confirmed each other's accounts of their single conversation on the night of November 15. Appellant adduced no evidence to suggest that the missing recording would have supported his theory of a frameup. Indeed, the record does not indicate that the recording would have

been helpful to appellant or that its loss prejudiced him in any way. Moreover, unlike the situation in *Buffalino, id.* at 449, there is no indication here that the missing tape was deliberately destroyed by government agents.

2. 49 U.S.C. § 782 provides that any vehicle used in violation of 49 U.S.C. § 781 shall be seized and forfeited. Section 781 outlaws using a vehicle to transport contraband articles, defined to include any narcotic drug. Similarly, 21 U.S.C. § 881(a) provides that controlled substances, their containers, and vehicles used to transport them "shall be subject to forfeiture to the United States and no property right shall exist in them."

*cert. denied*, 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977); *United States v. La Vecchia*, 513 F.2d 1210, 1215–17 (2d Cir. 1975); *United States v. Francolino*, 367 F.2d 1013, 1018–22 (2d Cir. 1966), *cert. denied*, 386 U.S. 960, 87 S.Ct. 1020, 18 L.Ed.2d 110 (1967).

■ The search of the suitcase itself, in contrast to the search of the trunk, was a minor issue below. *See* Transcript at 17–30, 163–71. Although it is unclear whether appellant objected to this search, the trial judge indicated that the suitcase, once taken from the trunk, was properly searched under the "controlled delivery" theory of *United States v. Bulgier*, 618 F.2d 472 (7th Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 51 (1980), and *United States v. Andrews*, 618 F.2d 646 (10th Cir.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 84, 66 L.Ed.2d 26 (1980). Those cases hold that, after private airline employees discover narcotics in a package and turn it over to the police, the police may make a controlled delivery of the package to the intended recipient and then search it without a warrant. The trial judge properly applied those cases here to uphold the search. *See United States v. De Berry*, 487 F.2d 448, 450–51 (2d Cir. 1973).

On appeal, appellant has not pressed his objection to the search of the suitcase. Subsequent to the argument of this case, however, the Supreme Court ruled that "a closed piece of luggage found in a lawfully searched car is constitutionally protected to the same extent as are closed pieces of luggage found anywhere else." *Robbins v. California*, —— U.S. ——, ——, 101 S.Ct. 2841, 2845, 69 L.Ed.2d 744 (1981) (plurality opinion). Although the search of the suitcase here was supported by the strongest probable cause imaginable (*i. e.*, the agents knew that the suitcase contained heroin because they had placed it there), the Supreme Court appears to have ruled that the existence of probable cause cannot excuse the need for a warrant. *Id.* at ——, 101 S.Ct. at 2844–45.

Nevertheless, *Robbins* does not require suppression of the contents of the suitcase

here. As a threshold matter, appellant lacks standing to object to the search of the bag. Appellant has insisted throughout the trial and the appeal that the suitcase is not his and that he was duped into claiming it. By his own admission, therefore, appellant could not have had any expectation of privacy as to the suitcase's contents. Thus, even if the search was illegal, it did not violate appellant's Fourth Amendment rights. *See Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980); *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 2552–55, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 133–40, 99 S.Ct. 421, 425–29, 58 L.Ed.2d 387 (1978); *United States v. Goshorn*, 628 F.2d 697, 699–701 (1st Cir. 1980).

The rationale of *Robbins*, moreover, is inapplicable to this case. In *Robbins*, the warrantless search of the luggage compartment was permissible under the "automobile exception"; but the Court held that the two factors underlying that exception—the inherent mobility of an automobile and the diminished expectation of privacy that surrounds it—do not justify warrantless searches of closed containers inside the automobile. —— U.S. at ——, 101 S.Ct. at 2845. Here, by contrast, the warrantless search of appellant's automobile was permissible because the car was subject to statutory forfeiture. Once the automobile was seized, appellant lost any expectation of privacy, at least as to the very article contained in the car that justified the forfeiture. *Cf. United States v. Zaicek*, 519 F.2d 412, 414–15 (2d Cir. 1975) (reversing suppression of contents of attache case found in trunk; search was permissible because car was properly seized). In fact, the heroin and the suitcase were themselves subject to forfeiture as a controlled substance and its container, and therefore "no property right ... exist[ed] in them." 21 U.S.C. § 881(a)(1), (3); *see United States v. Ledesma*, 499 F.2d 36, 39–40 (9th Cir.), *cert. denied*, 419 U.S. 1024, 95 S.Ct. 501, 42 L.Ed.2d 298 (1974).

Finally, even if *Robbins* were construed or extended to reach the situation presented

here, appellant would not be entitled to reversal. *Robbins* would likely not be applied retroactively to require suppression of evidence where probable cause for the search existed. Its application here would have no deterrent value, but only demoralizing effect. *See generally United States v. Peltier*, 422 U.S. 531, 535–39, 95 S.Ct. 2313, 2316–18, 45 L.Ed.2d 374 (1975); *United States v. Reda*, 563 F.2d 510, 511–12 (2d Cir. 1977), *cert. denied*, 435 U.S. 973, 98 S.Ct. 1617, 56 L.Ed.2d 65 (1978). Moreover, any error in admitting the contents of the suitcase was harmless: appellant conceded that he had claimed the suitcase in question; the suitcase itself was properly seized from the trunk of his car; and the agents and airline personnel involved testified without contravention that the suitcase seized was the same one that appellant had claimed, in which the heroin had been found, and in which a heroin exemplar had been left. Modica would therefore have been proved to have possessed heroin even if the heroin left in the suitcase had not been introduced. *Cf. United States v. Cirillo*, 499 F.2d 872, 888 (2d Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974) (affirming heroin conviction despite absence of direct proof that paper bag contained heroin; "There was ample circumstantial evidence that the bag contained heroin.")

### III. *The Claim of Prosecutorial Misconduct*

The central thrust of this appeal is that the prosecutor's improper statements in summation deprived appellant of a fair trial.[3] His summation was indeed improper in several respects. Nevertheless, the summation did not deprive Modica of a fair trial.

#### A. *The Improper Comments*

The first impropriety committed by the prosecutor was in vouching for Amato's veracity. In his summation, the prosecutor reviewed Amato's involvement in the case, and his testimony, at length. Recognizing that Amato's performance on the witness stand had been poor, the prosecutor argued for Amato's credibility. Initially, the prose-

cutor shied away from an outright endorsement, employing instead the rhetorical device "I suggest that":

> I suggest to you that Mr. Amato in part was a very truthful witness. There were parts that he wasn't truthful. I suggest to you he backed off things that he very clearly said to the grand jury about his conversation with Mr. Modica at Dyker Travel.

Transcript at 1056. A few moments later, the prosecutor conceded that it had been improper for Amato, as an airline employee, to moonlight as a travel agent. Then he continued:

> But I'm not here telling you that Mr. Amato is your A-1, Class-1 citizen. I'm here to tell you that Mr. Amato's testimony when it relates to the evidence in this case is truthful.

*Id.* at 1061. Appellant objected, but the judge overruled the objection.

The "I'm here to tell you" comment was improper. The American Bar Association Standards for Criminal Justice declare: "It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or guilt of the defendant." ABA Standards for Criminal Justice, Standard 3–5.8(b) (1980) [hereinafter cited as "ABA Standard (number)"]. The policies underlying this proscription go to the heart of a fair trial. The prosecutor is cloaked with the authority of the United States Government; he stands before the jury as the community's representative. His remarks are those, not simply of an advocate, but rather of a federal official duty-bound to see that justice is done. The jury knows that he has prepared and presented the case and that he has complete access to the facts uncovered in the government's investigation. Thus, when the prosecutor conveys to the jurors his personal view that a witness spoke the truth, it may be difficult for them to ignore his views, however biased and baseless they may in

---

3. Appellant mentions several other purported errors that, taken together, assertedly deprived him of a fair trial. *See* Appellant's Brief at 42–44. These claims are frivolous.

fact be. *See Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1934). Personal expressions of opinion are especially improper if phrased to leave the impression that the prosecutor's opinion is based on matters in the investigative file and not in the trial evidence. *United States v. Lamerson*, 457 F.2d 371, 372 (5th Cir. 1972) (per curiam); *McMillian v. United States*, 363 F.2d 165, 169 (5th Cir. 1966).

This Court has repeatedly warned prosecutors not to vouch for their witnesses' truthfulness, *see, e. g., United States v. Bivona*, 487 F.2d 443, 444–47 (2d Cir. 1973); *United States v. Santana*, 485 F.2d 365, 370–71 (2d Cir. 1973), *cert. denied*, 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974); *United States v. Drummond*, 481 F.2d 62, 63–64 (2d Cir. 1973); *cf. United States v. Gallagher*, 576 F.2d 1028, 1041–43 (3d Cir. 1978), *cert. dismissed*, 444 U.S. 1040, 100 S.Ct. 713, 62 L.Ed.2d 674 (1980); *United States v. Morris*, 568 F.2d 396, 400–02 (5th Cir. 1978), and has even reversed a conviction when a prosecutor repeatedly told the jury that certain testimony was true, *see United States v. Burse*, 531 F.2d 1151, 1154–55 (2d Cir. 1976); *cf. United States v. Lamerson*, 457 F.2d 371, 372 (5th Cir. 1972) (per curiam); *United States v. Handman*, 447 F.2d 853, 856 (7th Cir. 1971). Recently, this Court cited the ABA Standard quoted above and declared: "All prosecutors in this circuit should be guided by this rule in the future." *United States v. Sprayregen*, 577 F.2d 173, 174 n.2 (2d Cir.), *cert. denied*, 439 U.S. 979, 99 S.Ct. 563, 58 L.Ed.2d 649 (1978).

■ The trial court erred in overruling appellant's objection. The judge should have stricken the remark and immediately instructed the jurors to the effect that they could consider no evidence other than that presented to them; that the prosecutor was an advocate, not a sworn witness; and that they must treat the prosecutor's assertion as to the witness's veracity as non-evidentiary argument that they were free to reject.

A second improper statement by the prosecutor was closely related to his vouching for Amato's credibility. The prosecutor several times characterized witnesses, particularly Amato, as being "scared," apparently in order to explain their reticence and inconsistency. Defense counsel promptly objected to this characterization, concerned that the comments would suggest to the jury that Amato had been threatened for testifying against appellant. The trial judge initially refused to permit defense counsel to approach the bench, simply overruling his objections. Transcript at 1052–55. Apparently concerned that the jury might miss his point, the prosecutor then expressly suggested that Amato's fear was related to a mysterious third person who had accompanied appellant when he arrived at the airport to claim the missing suitcase:

> You heard Mr. Amato state that the defendant, Mr. Modica had someone else with him at the time. You heard Mr. Miradoli say that, too. You heard Mr. Costanzo, who testified today, say that, too. There is only one person who didn't say that—Mr. Modica. And when these witnesses—again, talking about Mr. Miradoli, Mr. Costanzo, Mr. Amato, when they were asked about this other person, did you see their reaction? Did they look like they were anxious, that they were trying to describe them? What did their faces look like? They were scared. I am telling you—.

Transcript at 1068.

Defense counsel objected. At the bench, he argued that the prosecutor was suggesting that the "witnesses were scared" and that "[t]here isn't any hint of a threat in this case." *Id.* The trial judge responded: "He [the prosecutor] is not suggesting that the threat comes from the defendant." *Id.* at 1068–69. Defense counsel said "I think that's a pretty clear implication," but the judge disagreed. *Id.* at 1069. Yet the testimony described the third person as having accompanied appellant, and Amato's alleged fear related to his testifying against appellant. The statement seems to have been designed to explain Amato's testimonial inadequacies by associating appellant with an unknown and threatening individual.

■ The trial judge should have sustained the objection and taken corrective action. A prosecutor is free to comment upon the evidence, including demeanor. But he may not use the presence of an unknown individual, concerning whom no evidence was introduced, as a vehicle for suggesting that the defendant is associated with threatening people. *See, e. g., United States v. Rios,* 611 F.2d 1335, 1342–43 (10th Cir. 1979); *United States v. Peak,* 498 F.2d 1337, 1339 (6th Cir. 1974); *United States v. Hayward,* 420 F.2d 142, 146–47 (D.C.Cir. 1969); *Hall v. United States,* 419 F.2d 582, 585 (5th Cir. 1969). Such a suggestion has a special potential for prejudice, moreover, when it is made by a prosecutor, who the jury may well think knows something about the defendant's mysterious associate that cannot be revealed, and who at the same time vouches for the truthfulness of the frightened witness's testimony.

A third impropriety occurred in the prosecutor's rebuttal summation. He closed his argument by saying:

> I submit to you that the Government has proven the proof. It has proven the charges in this case beyond every doubt. The proof is very clear. Don't let Mr. Modica walk out of this room laughing at you.

Transcript at 1164–65. Appellant's objection was overruled. *Id.* at 1165.

The apposite ABA Standard states a fundamental principle: "The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury." ABA Standard 3–5.8(c). *Cf. United States v. Hayward, supra,* 420 F.2d at 146 ("It is fundamental to sound procedure in federal criminal prosecutions that counsel refrain from 'appeal wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only [be] to arouse passion and prejudice.'") (quoting *Viereck v. United States,* 318 U.S. 236, 247, 63 S.Ct. 561, 566, 87 L.Ed. 734 (1943)). No trial—civil or criminal—should be decided upon the basis of the jurors' emotions. But the stricture against prejudicial appeals to the jury is most compelling with respect to the performance of a prosecutor, for the reasons given by the Supreme Court in *Berger v. United States, supra:*

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a proper one.

295 U.S. at 88, 55 S.Ct. at 633. In this case, the only conceivable purpose of the prosecutor's parting shot was to prejudice the jury. The observations of the Court of Appeals for the Fifth Circuit, with respect to a prosecutor's closing reference to a defendant as a "hoodlum," are applicable to the prosecutor's remarks here:

> This type of shorthand characterization of an accused, not based on evidence, is especially likely to stick in the minds of the jury and influence its deliberations. Out of the usual welter of grey facts it starkly rises—succinct, pithy, colorful, and expressed in a sharp break with the decorum which the citizen expects from the representative of his government.

*Hall v. United States, supra,* 419 F.2d at 587. The government does not deny in its brief that the comment was improper.

Here, again, defense counsel objected, but was overruled. The judge should immediately have charged the jurors that they were not to consider anyone's reaction—the prosecutor's or the defendant's—to their verdict, and that the only issue before them was whether the prosecution had proven its case.

In addition to the instances noted above, the summation was punctuated with excessive use of the personal pronoun "I." More than 60 times in the summation the prosecutor introduced a sentence with "I'm telling you" or "I suggest to you." Occasional use of such rhetorical devices is simply fair argument, *United States v. Murphy*, 374 F.2d 651, 655 (2d Cir.), *cert. denied*, 389 U.S. 836, 88 S.Ct. 47, 19 L.Ed.2d 98 (1967), but their constant use runs the risk that the jury may think the issue is whether the prosecutor is truthful, instead of whether his evidence is to be believed. A prosecutor should exercise restraint to avoid needless personal references, without sacrificing the vigor or effectiveness of his argument.

■ In sum, the prosecutor made a number of clearly improper remarks throughout his summation, and the district court should have sustained appellant's objections to those comments.

B. *The Absence of Substantial Prejudice*

Appellant asserts that the cumulative effect of the improper statements was to deny him a fair trial. A prosecutor's improper summation results in a denial of due process when the improper statements cause substantial prejudice to the defendant. *See, e. g., United States v. Bivona, supra*, 487 F.2d at 444; *United States v. White*, 486 F.2d 204, 205 (2d Cir. 1973), *cert. denied*, 415 U.S. 980, 94 S.Ct. 1569, 39 L.Ed.2d 876 (1974); *cf. United States v. Morris, supra*, 568 F.2d at 402. Often, the existence of substantial prejudice turns upon the strength of the government's case: if proof of guilt is strong, then the prejudicial effect of the comments tends to be deemed insubstantial; if proof of guilt is weak, then improper statements are more likely to result in reversal. *Compare United States v. Gallagher, supra*, 576 F.2d at 1042–43 *and United States v. Benter*, 457 F.2d 1174, 1178 (2d Cir.), *cert. denied*, 409 U.S. 842, 93 S.Ct. 41, 34 L.Ed.2d 82 (1972)

*with Berger v. United States, supra*, 295 U.S. at 88–89, 55 S.Ct. at 633 *and United States v. Burse, supra*, 531 F.2d at 1155. More comprehensively, however, determining the existence of substantial prejudice involves three factors: the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements. *See generally* Vess, *Walking a Tightrope; A Survey of Limitations on the Prosecutor's Closing Argument*, 64 J.Crim.L. & Criminology 22, 54–55 (1973).

The first question is whether the improper comments were "minor aberrations in a prolonged trial" or "cumulative evidence of a proceeding dominated by passion and prejudice." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240, 60 S.Ct. 811, 852, 84 L.Ed. 1129 (1940); *see, e. g., United States v. Sprayregen, supra*, 577 F.2d at 175; *United States v. Wilner*, 523 F.2d 68, 73–74 (2d Cir. 1975). Among the elements weighed in this inquiry are the extent to which the misconduct was intentional and the extent to which the statements were made in response to defense contentions. Here, the prosecutor's offending behavior was confined to his summation: his opening statement and his conduct throughout the six-day trial were free of improper remarks. This was not a trial marked by passion and prejudice. At no time did the prosecutor disregard any rulings of the trial court; in fact, the prosecutor changed the gist of his argument as to why Amato was scared, immediately after the trial judge had overruled the objection to his initial comment.[4]

The trial court made no effort to cure the effects of the improper remarks. *Cf. United States v. Morris, supra*, 568 F.2d at 402; *United States v. Farnkoff*, 535 F.2d 661, 668 (1st Cir. 1976). The judge erroneously overruled appellant's objections and therefore never utilized the authority at his disposal to minimize any prejudice—for example, by

---

4. Defense counsel objected that the prosecutor's remarks implied that defendant had threatened the witnesses. Although the judge overruled the objection, the prosecutor then explained: "As I was saying, all these Alitalia

employees were scared. They were scared to be here, scared to be involved in any criminal matter, scared in general to be in a courtroom, scared to be testifying in a criminal case." Transcript at 1068–69.

ordering the remarks stricken or issuing cautionary instructions. The court's pattern instruction to the jury—that the arguments of counsel are not to be considered evidence—was proper, but was an insufficient response to the prosecutor's conduct.

Nevertheless, the trial record strongly indicates that the jury would have convicted appellant even if the improper statements had not been made. The case against appellant was overwhelming; he was caught red-handed, and his explanation was implausible and refuted.

Numerous witnesses—other than Amato—flatly contradicted appellant on facts critical to his claim that he was an innocent bystander framed by Amato. An Alitalia employee, Costanzo, testified that appellant had approached him on the afternoon of November 12 looking for Amato; appellant claimed that he had never seen or spoken with Costanzo and that his meeting Amato had been fortuitous. Appellant claimed that he was looking for a second lost suitcase from his November 11 flight; Miradoli testified that appellant had asked him on November 12 (after Amato had left the lost-and-found room) to help locate a bag left by his aunt from the October 22 flight. Appellant claimed that, on the night of November 12, Amato had pointed to the suspect suitcase as the one to select; DEA agent Mella, stationed down the hallway, denied that Amato had pointed. These contradictions, by witnesses other than Amato, undermined appellant's credibility and his defense.[5]

Appellant's story was so inherently implausible, moreover, that it is unlikely that the jury would have accepted it. His claim that the note that he handed to Amato with the letters "RWUY" referred to a cleaner named "Rightaway," and not to the luggage brandmark "Airway," was incredible. Similarly, appellant's assertion that he took the suitcase without opening it to see if it

was his, because he could always bring it back, made no sense. Above all, the unlikely claims of coincidence—that appellant had happened along just as Amato was looking for someone to frame; that he had lost a bag just like the one containing the heroin—strained belief, particularly in light of the contradictions of appellant by sundry witnesses.

In sum, the prosecutor's remarks, although improper and uncorrected, did not result in substantial prejudice to appellant or deprive him of a fair trial. His summation remarks were the only improper behavior that occurred, and the case against appellant was so strong that the jury in all probability would have found him guilty even absent the improper comments.

### IV. Alternative Sanctions for Prosecutorial Misconduct

We thus find ourselves in a situation with which this Court is all too familiar: a prosecutor has delivered an improper summation, despite this Court's oft-expressed concern over the frequency with which improper prosecution summations occur. See, e. g., United States v. Sprayregen, supra, 577 F.2d at 174; United States v. White, supra, 486 F.2d at 206 & n.4. See generally Note, Prosecutorial Misconduct—Recent Second Circuit Cases, 2 Hofstra L.Rev. 385 (1974); Annot., 41 A.L.R.Fed. 10 (1979). Yet, just as this Court has often brandished the sword of reversal only to resheath it in the absence of substantial prejudice, here, too, we find no basis to reverse the underlying conviction.

Instead of reversing, this Court (like others) has often issued warnings. We hesitate to conclude that prior warnings have been ineffectual; improper summations might be far more frequent but for this Court's searching review of trial records. One can safely say, however, that warnings alone have proved insufficient. This Court,

---

5. Although these were the most significant contradictions of appellant's testimony, they were not the only ones. For example, appellant said that he had gone to the airport alone on the evening of November 12; Miradoli testified that another person had accompanied appel-

lant. Appellant claimed that Amato had told him to go home on the afternoon of November 12 to get his claim checks; Finiello testified that it was he, not Amato, who had requested the claim checks.

in particular, has repeatedly expressed frustration at the regular appearance on its docket of cases in which prosecutors have delivered improper summations. For example, in reviewing another conviction, the Court observed:

> We are reminded in summation cases that repeated rebukes of the prosecution by an appellate court without reversal may ultimately become "an attitude of helpless piety," and our "deprecatory words ... purely ceremonial." ... We trust that the rebukes in *United States v. Isaza*, [453 F.2d 1259 (2d Cir. 1972)] and here, however, will not go unheeded by the prosecutorial staff involved for another time the evidence of guilt may be less convincing and the likelihood of prejudicial error correspondingly higher.

*United States v. Benter, supra,* 457 F.2d at 1178 (citations omitted). That warning was reiterated in *United States v. Bivona, supra,* in which this Court threatened to reverse convictions even absent substantial prejudice:

> Although we conclude that reversal is not required here, we cannot ignore the numerous departures from approved prosecutorial advocacy which have been called to our attention within the last six months. Thus, we have considered whether the dramatic step of upsetting a conviction is the only way to deter future prosecutorial misconduct.... [U]nless the prosecutor heeds our recent warnings, we may be left with no alternative but to reverse convictions where the argument of the prosecution goes beyond what is permissible and fair. But, we fully expect that our criticism ... will not fall on deaf ears.

487 F.2d at 447 (citations omitted). Other courts have issued similar warnings. *See, e. g., United States v. Farnkoff, supra,* 535 F.2d at 668 n.17; *United States v. Freeman,* 514 F.2d 1314, 1321 (D.C.Cir.1975), *vacated per curiam on other grounds,* 598 F.2d 306 (D.C.Cir.1979); *Harris v. U. S.,* 402 F.2d 656, 659 (D.C.Cir.1968).

Despite numerous threats to reverse convictions for prosecutorial misconduct, federal courts have seldom invoked that sanction. This Court, in fact, has only in rare and peculiar cases reversed a criminal conviction because of an improper summation, absent substantial prejudice. *See United States v. Drummond,* 481 F.2d 62 (2d Cir. 1973) (third recent appeal involving improper summations by same prosecutor).

Given this Court's unwillingness to use reversals as a means of disciplining prosecutors, threats to do so seem unlikely to have much effect. As a practical matter, prosecutors know that courts are reluctant to overturn convictions because of improper remarks, when the defendant's guilt is clear. One commentator has summed up the way in which threats of reversal are perceived:

> Academic commentators have generally despaired of appellate reversal as an effective means of controlling prosecutorial misconduct. They have referred to reversal as a "quasi-sanction" and have said, "Appellate justices time and again have condemned ... poor conduct and warned prosecutors to keep within the bounds of propriety. Later opinions reflect the result—frustrating failure." These academic observers have found it imperative that "two distinct problems—justice and discipline—be kept separate."

Alschuler, *Courtroom Misconduct by Prosecutors and Trial Judges,* 50 Tex.L.Rev. 629, 645 (1972) (footnotes omitted). *See* Note, *Prosecutor Indiscretion: A Result of Political Influence,* 34 Ind.L.J. 477, 487 (1959) ("The appellate tribunals have found to their dismay that they cannot uphold a conviction and yet successfully condemn the method by which it was secured. Carefully written opinions condemning the indiscretion and misconduct have not been successful to curb improprieties. The very act of upholding the conviction has given prosecutors approval, and the 'judicial slap on the wrist' has not deterred the prosecutor from his unethical and improper tactics." (footnotes omitted)).

We share the frustration voiced by commentators at the inability of some federal prosecutors to abide by well-established

rules limiting the types of comments permissible in summation. But we disagree that the solution lies in reversing valid convictions. Ordering a new trial remains among the measures that the Court may apply in a particular case, and we believe that its availability has some deterrent effect. But its invocation is properly shunned when the misconduct has not substantially prejudiced a defendant's trial. Reversal is an ill-suited remedy for prosecutorial misconduct; it does not affect the prosecutor directly, but rather imposes upon society the cost of retrying an individual who was fairly convicted.

Judges and commentators have frequently criticized the high social cost and minimal benefits engendered by reversing convictions because of improperly obtained evidence. See, e. g., California v. Minjares, 443 U.S. 916, 916–28, 100 S.Ct. 9, 9–15, 61 L.Ed.2d 892 (1979) (mem.) (Rehnquist, J., dissenting); Bivens v. Six Unknown Named Agents, 403 U.S. 388, 415–24, 91 S.Ct. 1999, 2014–19, 29 L.Ed.2d 619 (1971) (Burger, C. J., dissenting); Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U.Chi.L.Rev. 665 (1970); Wilkey, The Exclusionary Rule: Why Suppress Valid Evidence? 62 Judicature 215 (1978). To impose such a remedy in the present context is even less justifiable. Prosecutorial misconduct that causes no substantial prejudice has, by definition, not resulted in a constitutional deprivation; an illegal search or seizure, by contrast, perforce violates the Fourth Amendment. Furthermore, prosecutors act under the immediate supervision of trial judges; law-enforcement personnel, on the other hand, act beyond the view of judges, in the homes and on the persons of individuals under investigation. The need for a potent deterrent device is less compelling in the former situation, and the resulting cost to society is less justifiable. Finally, reversal of convictions seems even less likely to be effective in deterring prosecutors than it has been in affecting the conduct of police. The federal prosecutors in this Circuit tend to be relatively young attorneys, seeking valuable experience as a prelude to other professional endeavors; such individuals are unlikely to share the institutional concerns found in career law-enforcement personnel. By contrast, sanctions imposed directly upon young, upwardly mobile prosecutors are likely to evoke strong concern and direct response.[6]

Several recent decisions clearly reflect the Supreme Court's reluctance to overturn convictions based upon illegally seized evidence when the outcome of the trial was not unjust. See, e. g., Michigan v. De Fillippo, 443 U.S. 31, 38 n.3, 99 S.Ct. 2627, 2633, 61 L.Ed.2d 343 (1979); United States v. Ceccolini, 435 U.S. 268, 275–76, 98 S.Ct. 1054, 1059–60, 55 L.Ed.2d 268 (1978); Stone v. Powell, 428 U.S. 465, 486–89, 96 S.Ct. 3037, 3048–50, 49 L.Ed.2d 1067 (1976). Similarly, the Court has disfavored reversal of convictions that were obtained through questionable law enforcement practices, absent a finding that the defendant's constitutional rights were violated and that he was prejudiced thereby. See, e. g., United States v. Morrison, 449 U.S. 361, 365–66, 101 S.Ct. 665, 668–69, 66 L.Ed.2d 564 (1981) (dismissal of indictment); United States v. Payner, 447 U.S. 727, 100 S.Ct. 2439, 2445–47, 65 L.Ed.2d 468 (1980). Recognizing the general inappropriateness of reversal as a sanction for nonprejudicial prosecutorial misconduct is a necessary first step in the task of fashioning remedies that are more appropriate and, hence, more likely to be invoked.

### A. Role of the Trial Court

This court has repeatedly stated that the task of ensuring that attorneys conduct themselves pursuant to recognized ethical precepts falls primarily upon district courts. See, e. g., Lefrak v. Arabian American Oil Co., 527 F.2d 1136, 1140 (2d Cir. 1975); NCK Organization, Ltd. v. Bregman, 542 F.2d 128, 131 (2d Cir. 1976). The district

---

**6.** But cf. United States v. Freeman, supra, 514 F.2d at 1321 n.45 ("In this area [reversal for improper prosecution summation], unlike the realm of police misconduct addressed by the fourth amendment exclusionary rule, the burden of reversal falls directly on the one responsible for the misconduct.").

judge is in an especially well-suited position to control the overall tenor of the trial. He can order the offending statements to cease and can instruct the jury in such a manner as to erase the taint of improper remarks that are made. The ABA Standards For Criminal Justice recognize that "[i]t is the responsibility of the [trial] court to ensure that final argument to the jury is kept within proper, accepted bounds." ABA Standard 3–5.8. The trial judge can interrupt to anticipate and cut off an improper line of argument. Once the offending remarks are made, the judge can strike them and forcefully instruct the jury as to their inappropriateness. If persuaded in a rare case that irreparable prejudice has occurred, the court retains the option of granting a motion for a mistrial.

Beyond these traditional trial-conduct remedies, the court has a range of remedies that may, in appropriate circumstances, be directed specifically at the attorney. Initially, the court may consider a reprimand, delivered on the spot or deferred until the jury has been excused from the courtroom. Flagrant conduct, in violation of a court order to desist, may warrant contempt penalties. If the conduct has occurred on prior occasions, the court may wish to give serious consideration to a formal reference to the appropriate local grievance committee to assess the need for disciplinary proceedings. Alternatively, persistent misconduct may warrant action by the court itself to initiate proceedings to determine the appropriateness of a suspension from practice before the District Court. We suspect that the message of a single 30-day suspension from practice would be far clearer than the disapproving remarks in a score of appellate opinions.

### B. Authority of the Circuit Court

The Court of Appeals also has power to fashion remedies directly against an attorney persistently engaging in improper courtroom conduct. See United States v. Thomas, 474 F.2d 110, 111–12 (10th Cir.), cert. denied, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973). A reprimand in a published opinion that names the prosecutor is not without deterrent effect.[7] A Court of Appeals, exercising its supervisory power over the administration of criminal justice,[8] may well have authority to direct the initiation of appropriate action in the District Court or, alternatively, to take action of a disciplinary nature with respect to practice before the federal courts of the Circuit, including possible temporary suspensions. We need not probe the full extent of such authority at this time.[9] We deem it suffi-

---

**7.** We note that appellate courts have generally been reluctant to name the individual prosecutors whose comments have been found improper. Among the many reported decisions of this Court in the last decade, apparently only two identify the prosecutor. One does so obliquely, by quoting the trial judge's statement to him. United States v. Drummond, supra, 481 F.2d at 63. The other notes that the prosecuting attorney argued the appeal. United States v. Stahl, 616 F.2d 30, 32 (2d Cir. 1980). We refrain from naming the prosecutor in this case because his improper remarks, though ill-advised, were not instances of deliberate misconduct.

**8.** See United States v. Payner, 447 U.S. 727, 735 n.7, 100 S.Ct. 2439, 2446, 65 L.Ed.2d 468 (1980) (supervisory power "permits federal courts to supervise the administration of criminal justice among the parties before the bar"); United States v. Jacobs, 547 F.2d 772, 775–76 (2d Cir.), cert. dismissed, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1976); United States v. Toscanino, 500 F.2d 267, 276 (2d Cir. 1974).

**9.** A separate, potential basis for appellate discipline of attorneys is the courts' duty to enforce ethical standards. Improper statements by federal prosecutors constitute unethical conduct, regardless of whether they justify reversal in a particular case. Inflammatory remarks or personal attestations as to guilt or credibility violate the Code of Professional Responsibility. See, e. g., United States v. Splain, 545 F.2d 1131, 1135 (8th Cir. 1976); Olenin v. Curtin & Johnson, Inc., 424 F.2d 769, 769–70 (D.C.Cir. 1970); United States v. Munford, 431 F.Supp. 278, 289 (E.D.Pa.1977); ABA Code of Professional Responsibility, Disciplinary Rule 7–106(C) & Ethical Consideration 7–24. We leave unexamined at this time the limits on this power implicit in our ruling in Armstrong v. McAlpin, 625 F.2d 433 (2d Cir. 1980) (en banc), vacated on other grounds, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981).

cient to express our concerns and to alert the district courts to their range of remedies, with confidence that the proper discharge of their responsibilities will prove to be a sufficient deterrent.

We do not suggest that the improper summation in this case warranted more than prompt admonishment and curative instructions by the District Court. At the same time we hope to have made it clear that improper summations in the future, especially if done on repeated occasions by the same prosecutor, run the distinct risk of direct sanctions against the attorney. We expect the able attorneys who supervise federal prosecutors throughout this Circuit to renew their efforts to maintain the high level of conduct that has traditionally characterized the office of the United States Attorney.

The judgment of conviction is affirmed.