911 F.2d 734
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Emmeramo F. LOPEZ,
and
Caridad Roque, Defendants-Appellants.
 Nos. 89-3988, 89-3989.
 United States Court of Appeals, Sixth Circuit.
 Aug. 13, 1990.
 
 Before BOYCE F. MARTIN, Jr. and DAVID A. NELSON, Circuit Judges, and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendants Emmeramo Felix Lopez, a.k.a. Felix Norcisa, and Caridad Roque appeal their convictions for conspiracy to possess with intent to distribute cocaine and for interstate travel to further that unlawful activity. They contend that although the evidence adduced at trial indicated that they were part of a conspiracy, it was insufficient to show they were guilty of the conspiracy charged in the indictment. They also contend that the district court erred by not granting a mistrial when the prosecutor made improper remarks during his opening statement. Finding the defendants' contentions unpersuasive, we shall affirm the convictions.
 
 
 2
 * In January of 1988 the United States Customs Service, working with the assistance of a confidential informant known as Juan Angarita (or Angerita), commenced an investigation of individuals in the Miami area who were suspected of being participants in a scheme for the importation of large amounts of cocaine from Colombia. The cocaine was to be brought into this country at the request of an individual known as "Louie," later identified as Louis Manuel Perez. The importation did not materialize, and in late April to early May of 1988 the informant advised his case agent that Louie--a "broker," as the government contends--now wanted to purchase cocaine that was already in the United States.
 
 
 3
 The informant told Louie that he could obtain 32 kilograms of cocaine in Ohio, and Louie agreed to the purchase. Louie subsequently introduced the informant to a man named Pedro Zamora. Mr. Zamora wanted to buy cocaine on behalf of an unnamed woman in Pennsylvania. The informant told Zamora that the exchange would have to take place in Ohio, and Mr. Zamora replied that he would have to clear this requirement with his buyer.
 
 
 4
 The informant eventually met Zamora at a hotel in Columbus, Ohio, and was told that the deal would be for only two kilograms of cocaine. The informant expressed disappointment at this. Mr. Zamora replied, "Hey, the lady here with another guy and they are inside there in the next room to me, and they are push me and push me to do the deal [for two kilograms]. They want to go back to Pennsylvania. And we need to do the deal." The informant put off the transaction briefly, telling Mr. Zamora he would call later.
 
 
 5
 After consulting with his governmental contacts, the informant called Zamora and told him a confederate would come to see the money. After the confederate--actually undercover Columbus Police Officer Lawrence Hoover--viewed the money and departed, he returned with a SWAT team. They raided both Zamora's room, where they arrested Mr. Zamora and seized approximately $32,000 in currency, and the adjoining room, where they arrested the defendants. (This statement of the facts is drawn largely from the testimony of the informant and Officer Hoover.)
 
 
 6
 Mr. Lopez and Ms. Roque were charged in a superseding indictment with conspiring to possess with intent to distribute 32 kilograms of cocaine (Count I) and with traveling in interstate commerce from Florida to Ohio, with intent to further the scheme (Count II). Mr. Zamora was charged in the same two counts and was also charged with using the telephone to further the conspiracy. Louie Perez and an individual known as "Flaco" were also charged with one or more offenses, but neither of them has yet been apprehended. Mr. Zamora entered into a plea agreement and testified against the defendants at trial.
 
 
 7
 Mr. Lopez and Ms. Roque were convicted on both of the counts on which they had been charged. Mr. Lopez was sentenced to 63 months' imprisonment on Count I and 60 months' imprisonment on Count II, the sentences to run concurrently. Ms. Roque received concurrent 41-month sentences on each count. Both defendants were also given terms of supervised release and were ordered to pay a $100 special assessment.
 
 II
 
 8
 The defendants first contend that the evidence adduced at trial demonstrated two separate, distinct conspiracies, and that they were not involved in the conspiracy charged in the indictment. They claim that one conspiracy, involving Louie and Flaco, was to purchase 32 kilograms of cocaine; the other, involving the defendants and Mr. Zamora, was to purchase two kilograms of cocaine.
 
 
 9
 This is not the first opportunity we have had to address questions such as those raised here. We can distill several relevant principles from the caselaw:
 
 
 10
 "In drug conspiracy cases pursuant to 21 U.S.C. Sec. 846, the government must prove that a conspiracy existed, that the accused knew of the conspiracy, and that he knowingly and voluntarily joined it.... Participation in the conspiracy's common purpose and plan may be inferred from the defendant's actions and reactions to the circumstances.... Proof of knowledge is satisfied by proof that the defendant knew the essential object of the conspiracy.... Every member of a conspiracy need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement."
 
 
 11
 United States v. Christian, 786 F.2d 203, 211 (6th Cir.1986) (citations and internal quotations omitted).
 
 
 12
 "Every variation between an indictment and proof at trial does not create reversible error. A variation that has the effect of actually or constructively amending the indictment requires reversal, whereas one that adds nothing to the indictment, while a variance, may constitute harmless error...."
 
 
 13
 "Variances ... will not result in reversal unless substantial rights of a defendant have been affected.... Substantial rights in turn, are affected only when a defendant shows prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions."
 
 
 14
 United States v. Zelinka, 862 F.2d 92, 96-97 (6th Cir.1988) (citations and internal quotations omitted).
 
 
 15
 "Whether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury ... and [is] to be considered on appeal in the light most favorable to the government." United States v. Kelley, 849 F.2d 999, 1002 (6th Cir.), cert. denied, 109 S.Ct. 532, 102 L.Ed.2d 564 (1988) (original emendation, quoting United States v. Grunsfeld, 558 F.2d 1231, 1238 (6th Cir.) (per curiam), cert. denied, 434 U.S. 872 (1977) and 434 U.S. 1016 (1988)).
 
 
 16
 Given these principles, we think it clear that the defendants could be found to have been part of the single conspiracy to purchase cocaine. Although Mr. Zamora testified that he told the informant when they met in Florida that this specific transaction would be for only two kilograms, the informant testified that until he met Mr. Zamora in Columbus, he understood the deal to be for 32 kilograms. His conduct at the time supports this view; if he had believed this was a separate and distinct conspiracy for only two kilograms, he would not have jeopardized the transaction by delaying it so that he could consult with his handlers.
 
 
 17
 The defendants urge that nothing links them and their two-kilogram conspiracy to Louis's 32-kilogram conspiracy beyond the fact that the informant was at the center of both deals. The informant's testimony belies this contention:
 
 
 18
 "Q. Okay. Now, during this course [of negotiating the 32-kilogram deal with Louis Perez], ultimately you then, of course, did meet Pedro Zamora?
 
 
 19
 A. Yeah. Three or four days later, he called me and he say--
 
 
 20
 Q. When you say 'he,' who do you mean?
 
 
 21
 A. Louis. He call me on my beeper and I met him in his place, and he told me, 'Hey, I got an old man here--
 
 
 22
 Q. Got a what?
 
 
 23
 A. Old man.
 
 
 24
 Q. Old man.
 
 
 25
 A. Yeah. And he called the guy. They guy was inside the warehouse. He called. The guy came outside, was Pedro Zamora. And he introduced me and he say, 'Him have a lady that want to buy the cocaine that you got."
 
 
 26
 The "lady" was Caridad Roque. If the informant's testimony is to be believed, a rational jury would have been entirely justified in finding that Louie, a somewhat less-than-honest broker, put the informant in touch with the defendants so that they could buy the informant's 32 kilograms of cocaine. That the quantity was subsequently reduced to two kilograms is immaterial to the existence of the conspiracy itself. Cf. United States v. Castro, No. 89-1528, slip op. at 3-5, --- F.2d ----, ---- (6th Cir. July 17, 1990) (affirming convictions of three defendants for offenses involving 119, 99, and 99 kilograms of cocaine, respectively, even though indictment tied defendants to over half a ton of the drug).
 
 III
 
 27
 During his opening argument, the prosecutor, a Mr. Lockhart, said:
 
 
 28
 "Mr. Angarita [the informant] is, as you will find from the evidence, a person who was born in Columbia [sic], and a person who later on in life decided that he was not happy with the drug situation and asked to become a confidential source or confidential informant, whatever word you might want to use, for the DEA, the Drug Enforcement Administration. And Mr. Angarita--by the way, that is not his true name. His true name has been changed to protect him and his family in Columbia [sic] from reprisals for his testimony in various cases, but Mr. Angarita--"
 
 
 29
 Defense counsel objected at this point and moved for a mistrial. The court denied the motion, saying, "I think Mr. Lockhart's statement was clear that any reprisals would be [from] people in Columbia [sic] because of his activities as a confidential informant generally." The court did, however, instruct the jury:
 
 
 30
 "THE COURT: Ladies and gentlemen, Mr. Lockhart made mention a moment ago about a prospective witness, a Mr. Angarita, in connection with possible reprisals from people in Columbia [sic] as a result of his activities as a confidential informant. I instruct you that there is no indication whatsoever, and I'm certain that Mr. Lockhart did not intend any indication, that there have been any threats whatsoever of any kind from the Defendants in this case or on behalf of the Defendants in this case, Mr. Lopez or Miss Roque, and I want to make that clear; that Mr. Lockhart's statement referred to the reason for this witness changing his name being a possible fear of some reprisals from people in Columbia [sic]. There is absolutely no indication that either of these Defendants or anybody on their behalf has in any manner threatened this witness.
 
 
 31
 Is that correct, Mr. Lockhart?
 
 
 32
 MR. LOCKHART: That is correct, your Honor.
 
 
 33
 THE COURT: You are therefore, ladies and gentlemen, instructed to disregard that remark insofar as it is pertinent in this case."
 
 
 34
 In United States v. Krebs, 788 F.2d 1166, 1177 (6th Cir.), cert. denied, 479 U.S. 930 (1986), we held that to warrant a new trial, prosecutorial misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial. In deciding whether to reverse a conviction, we consider whether the misconduct can be said to be harmless. If there is substantial evidence of guilt and the district court takes corrective measures to eliminate prejudice from the misconduct, we normally affirm the conviction.
 
 
 35
 That is the situation here. Although the prosecutor's remarks may have been inappropriate, the district court gave a clear curative instruction. The cases on which the defendants rely involve much more egregious prosecutorial misbehavior. In United States v. Peak, 498 F.2d 1337 (6th Cir.1974), the prosecutor expressed his personal belief that the defendant was a person of bad character--indeed, that the defendant "has the worst character and reputation of anybody in Madison, Indiana"--and made reference to threats of specific harm at the hands of the defendant and his associates. See 498 F.2d at 1338-39.
 
 
 36
 In United States v. Rios, 611 F.2d 1335 (10th Cir.1979), the prosecutor, without any factual basis, alleged that a defense witness had contrived his answers with the defendant, implied that the defendant had threatened prosecution witnesses, and asserted his own personal belief that the defendant was "a genuine certified Mr. Big in the heroin business." See 611 F.2d at 1341-42.
 
 
 37
 Finally, in United States v. Modica, 663 F.2d 1173 (2d Cir.1981) (per curiam), cert. denied, 456 U.S. 989 (1982), the prosecutor explicitly vouched for the credibility of a government witness, implied an associate of the defendant intimidated witnesses, and urged the jury not to let the defendant "walk out of this room laughing at you." The district court overruled all of defense counsel's objections, but the Second Circuit affirmed the conviction, finding that because of the other, strong evidence against the defendant, there was no substantial prejudice. See 663 F.2d at 1178-82.
 
 
 38
 The defendants also argue that aside from the "implication" that they were behind the threats against Mr. Angarita, the prosecutor's remarks worked to bolster the informant's credibility by portraying him as a heroic, self-sacrificing crime fighter. But Mr. Angarita's own testimony--to which the defendants did not object--provided the details of the events that led him to become an informant. That testimony opened the door to exploration of his motivation on cross-examination, and the jury was thus in a position to decide the question for itself. Any lingering effect of the prosecutor's remark in light of the subsequent testimony on this issue would have been minimal.
 
 
 39
 AFFIRMED.