79 F.3d 338
 UNITED STATES of America, Appellee,
v.
Samuel Ignatius MILLAR, also Known as Andre Singleton, also
Known as Frank Saunders, Thomas F. O'Connor, and
Charles McCormick, Defendants,
Patrick Moloney, Defendant-Appellant.
 No. 559, Docket 95-1142.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 14, 1995.
Decided April 1, 1996.
 
 Appeal from a conviction and sentence for conspiracy to possess money stolen from a bank, in the United States District Court for the Western District of New York (David G. Larimer, Judge ) following a jury trial. Remanded for factual finding and resentencing, if appropriate, based on U.S.S.G. § 2B1.1(b)(7)(B), concerning the amount of gross receipts derived by appellant.
 William Clauss, Assistant Federal Public Defender, Western District of New York, Rochester, New York (Jonathan W. Feldman, Federal Public Defender, of counsel), for Defendant-Appellant.
 Christopher A. Buscaglia, Assistant United States Attorney, Western District of New York, Rochester, New York (Patrick H. NeMoyer, United States Attorney; Christopher V. Taffe, Assistant United States Attorney; of counsel), for Appellee.
 Before: WINTER, WALKER, and CABRANES, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Patrick Moloney, a Melkite Catholic priest, appeals from his conviction and sentence after an eight-week jury trial before Judge Larimer. Moloney was convicted of a single count of conspiracy to possess money stolen from a bank in violation of 18 U.S.C. § 371 and was sentenced to fifty-one months imprisonment, three years supervised release, and a fifty-dollar special assessment. He appeals on a variety of grounds, including a challenge to the district court's calculation of his sentence based on receipt of 2.2 million dollars in proceeds from a crime affecting a financial institution. See U.S.S.G. § 2B1.1(b)(7)(B).[1] Moloney contends he did not personally possess that amount because access to the money was shared with co-defendant Samuel Millar. We remand for factual findings regarding the amount of gross receipts derived by Moloney. We affirm with respect to all other claims, except one that is dismissed for lack of jurisdiction.
 
 BACKGROUND
 
 2
 We view the evidence in the light most favorable to the government. On the evening of January 5, 1993, three employees of the Brinks Armored Car Company were on duty at the Brinks money depot in Rochester, New York. Shortly after 6:00 p.m., two of them were accosted by two masked, armed gunmen and forced to lie face-down on the floor of the vault room. The third employee, Thomas O'Connor, had left the vault moments earlier. While bound and blindfolded on the floor, the two employees heard the robbers loading money into a vehicle apparently parked in the depot's garage. After about an hour, the robbers left the premises, and the two Brinks employees freed themselves. Approximately 7.4 million dollars, and O'Connor, were missing.
 
 
 3
 O'Connor told police that he had been taken captive by the robbers but quickly became a suspect in the robbery. In considering O'Connor's possible role, an FBI Special Agent recalled an earlier investigation that revealed an association between O'Connor and Millar, an illegal Irish alien. Law enforcement officers established surveillance of Millar in the New York City area. FBI agents observed Millar meeting with Moloney at various locations, including Millar's business and an apartment at 330 First Avenue in Manhattan. The FBI also learned that Moloney had purchased a new Ford Explorer truck on June 18, 1993 and had insured the vehicle in his name, although the vehicle was driven exclusively by Millar. On August 5, 1993, Millar was seen carrying several duffel bags from his residence, loading them into the Explorer, driving to a First Avenue apartment building, and carrying the bags into the building. Agents observed shapes resembling bundled money in the bags and began to suspect that Millar was hiding the stolen Brinks money.
 
 
 4
 On August 6, 1993, agents observed Moloney entering the First Avenue apartment building. He was seen entering the building on six other occasions in August, twice in the company of Millar. Investigators learned that in July Moloney arranged with co-defendant Charles McCormick to use McCormick's apartment, number 10D. On November 6, 1993, FBI technicians installed in the tenth floor common hallway a closed circuit television camera (CCTV) that enabled investigators to view the doorway to the apartment. That same day, agents observed Moloney on CCTV entering Apartment 10D with two folding card tables. Moloney remained there for 36 minutes and then left with a loaded knapsack. On November 7, agents saw Moloney and Millar enter the apartment together. Moloney had an electronic money counting machine under his arm. After Moloney left by car, agents saw him counting a two-inch thick stack of currency at a traffic light. On November 9, Moloney was seen leaving Apartment 10D with a money belt, which he tied around his waist in the hallway.
 
 
 5
 Between November 6 and 11, Moloney spent six and one-half hours and Millar spent almost nine hours in Apartment 10D. During six of those hours, they were together. Each had his own key to the apartment, which had a newly installed lock. On November 11, Millar and Moloney met with a real estate agent in Westchester County, New York regarding Millar's search for a home in the $300,000 price range. Moloney claimed that financing for the home would be arranged through his church.
 
 
 6
 Apartment 10D was searched on November 11 and 12. Investigators found 2.1 million dollars hidden in a locked bedroom closet. From a list of serialized new bills stolen from the Brinks depot, agents identified $107,980 as money stolen during the January 5 robbery in Rochester. Agents also found a suitcase that had Moloney's then-current address and telephone number on it. The suitcase contained $849,000. A separate bag of cash contained a hair that possessed physical characteristics similar to Moloney's hair. Moloney's fingerprints were found on a glass in the bedroom. A money counter, rubber gloves, a calculator, two pens, and several pieces of paper with money figures in handwriting similar to Moloney's were found on card tables in the bedroom. The calculator's vinyl wallet contained a card depicting a religious figure from the Melkite Catholic Church.
 
 
 7
 Investigators searched Moloney's residence and found documents bearing aliases used by Millar and others. They also found license plates to a minivan owned by the mother of Millar's children, which agents had earlier observed Millar driving. Although the minivan itself had disappeared, the minivan's model had wheelbase measurements that corresponded with those at the scene of the Brinks robbery. The search of Moloney's residence also produced a list of loans that he had made and a description of real estate in Florida that he had offered to buy for $150,000 cash. In a safe in Moloney's bedroom, agents found approximately $168,000 in cash. Some of the stacks of bills bore numerical figures in ink resembling the figures found in Apartment 10D. A forensic evaluation of the chemical composition of the ink on the bills in Moloney's bedroom determined that it was consistent with ink on the notations and in the pens found in Apartment 10D.
 
 
 8
 Moloney was arrested at his residence. In a post-arrest statement, he claimed that he began using Apartment 10D only in September, could not recall whether he carried a money counting machine into the apartment, had no knowledge of locked closets within the apartment, and never saw any money there.
 
 
 9
 After three days of deliberation, the jury convicted Moloney of conspiracy to possess stolen money in violation of 18 U.S.C. § 371. At sentencing, the district court denied Moloney's motion for a downward departure and adopted findings in the Presentence Report (PSR) that enhanced Moloney's sentence under the Sentencing Guidelines. Moloney was sentenced to fifty-one months imprisonment.
 
 
 10
 Moloney claims reversible error in: (i) the district court's emphasis of Moloney's status as a priest during jury selection; (ii) its dismissal of a juror during trial; (iii) the denial of Moloney's request for a hearing on the validity of the search warrants; (iv) the prosecution's summation; (v) the insufficiency of the proof underlying conviction for conspiracy; (vi) the court's supplemental jury instructions; (vii) the court's refusal to grant a downward departure in light of Moloney's charitable works and public service; and (viii) the application of U.S.S.G. § 2B1.1(b)(7)(b), which relates to crimes that affect financial institutions and from which the defendant derived more than 1 million dollars in gross receipts, to increase Moloney's offense level and enhance his sentence.
 
 DISCUSSION
 1. Jury Selection
 
 11
 Moloney challenges the district court's voir dire inquiry into potential jurors' religious prejudices. However, the Supreme Court has held that "[w]ithout an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.... [F]ederal judges have been accorded ample discretion in determining how best to conduct ... voir dire." Rosales-Lopez v. United States, 451 U.S. 182, 188-89, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981). Therefore, it was well within the district court's discretion to conclude that, in the trial of a priest, an inquiry into religious bias was appropriate to ensure an impartial jury.
 
 2. Juror Dismissal
 
 12
 The district court also did not abuse its discretion in dismissing a juror whose father died suddenly during the trial. "[S]ubstitution of an alternate juror for reasonable cause is the prerogative of the court and does not require the consent of any party." United States v. Floyd, 496 F.2d 982, 990 (2d Cir.), cert. denied, 419 U.S. 1069, 95 S.Ct. 654, 42 L.Ed.2d 664 (1974). Moloney contends that the district court abused its discretion in not affording counsel the opportunity to be heard prior to the juror's dismissal. The record, however, is to the contrary. The court did not make a final determination on whether to substitute an alternate juror until after hearing counsel out. In any event, appellant has shown no prejudice resulting from the substitution. See United States v. Gambino, 951 F.2d 498, 503 (2d Cir.1991) (district court's discretion in dismissing juror should not be disturbed absent bias or prejudice to the defendant), cert. denied, 504 U.S. 918, 112 S.Ct. 1962, 118 L.Ed.2d 563 (1992).
 
 
 13
 3. Denial of Hearing Regarding a Search Warrant
 
 
 14
 Moloney claims that the district court abused its discretion when it failed to grant him a factual hearing, pursuant to Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), on whether an affidavit supporting a November 8, 1993 FBI search warrant contained a false statement. The affidavit in question stated that Moloney had purchased a car with approximately $26,000 in cash when in fact he had purchased the car with a combination of cash, cashier's checks, and a $500 personal check. A defendant is entitled to a Franks hearing upon a "substantial preliminary showing" that the affiant "knowingly and intentionally, or with reckless disregard for the truth," included in the affidavit a false statement necessary to the finding of probable cause. Id. at 155-56, 98 S.Ct. at 2676-77. There is no evidence here of deliberate prevarication. Moreover, the claimed inaccuracies in the affidavit--all of which indicate ready access to cash in the amount of $26,000--in no way undermined the showing of probable cause. The denial of a hearing was, therefore, not error.
 
 4. The Prosecution's Summation
 
 15
 Moloney argues that the prosecutor engaged in various forms of misconduct during summation sufficient to require reversal. In advancing this argument Moloney bears a substantial burden. See United States v. Young, 470 U.S. 1, 11-12, 105 S.Ct. 1038, 1044-45, 84 L.Ed.2d 1 (1985) ("a criminal conviction is not to be lightly overturned on the basis of a prosecutor's [inappropriate] comments standing alone"); United States v. Modica, 663 F.2d 1173, 1184 (2d Cir.1981) ("[r]eversal is an ill-suited remedy for prosecutorial misconduct"), cert. denied, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). An improper summation requires a new trial where the statements cause "substantial prejudice" to the defendant. Modica, 663 F.2d at 1181. In determining whether the misconduct rises to the level of "substantial prejudice," we consider the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper statements. United States v. Tutino, 883 F.2d 1125, 1136 (2d Cir.1989), cert. denied, 493 U.S. 1082, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990).
 
 
 16
 Moloney argues that the during the course of the government's closing argument, the prosecutor improperly referred to evidence not introduced at trial, focused on Moloney's religious beliefs, made personal attacks on defendant's counsel, and shifted the burden of proof.
 
 
 17
 Although the prosecutor impermissibly referred to an exhibit not admitted into evidence, the error was an unintentional and harmless oversight. See Modica, 663 F.2d at 1181 (one of the factors in determining the severity of the conduct is the extent to which the conduct was intentional). The district court found that the government had intended to offer the exhibit in evidence as one of a group of items but simply forgot to have the particular item in question marked. Then, in closing, the prosecutor inadvertently assumed that that item, like the others, was properly before the jury. We believe that his remark could not have altered the outcome of the trial because the document in question was useful only to discredit a defense witness whose testimony was entirely cumulative. Moreover, Judge Larimer's instructions to the jury to disregard the prosecutor's comments were sufficiently curative to eliminate any possible prejudice. See Tutino, 883 F.2d at 1137.
 
 
 18
 Moloney's second claim of misconduct involves the prosecutor's references to Moloney's status as a priest. These references, he argues, inflamed the jury and unduly prejudiced him. However, because Moloney's counsel did not object to the prosecutor's statements (except to object to the term "parish priest" on the ground that Moloney did not have a parish), we may overturn the verdict only if admission of the statements constituted plain error. See United States v. Melendez, 60 F.3d 41, 48 (2d Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 258, 133 L.Ed.2d 182 (1995). There was no such error. Defense counsel similarly invoked Moloney's status as a priest in an attempt to portray him as a holy and pious man of good works. The prosecutor's references were at least in part a legitimate rejoinder and certainly do not constitute misconduct sufficient to warrant a new trial. See United States v. Goldman, 563 F.2d 501, 504-05 (1st Cir.1977) (prosecutor's statement that defendant's conduct demeaned his wearing of a yarmulke showed "extremely poor judgment" but did not require reversal), cert. denied, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768 (1978).
 
 
 19
 Moloney's third challenge to the government's summation is that the prosecutor personally attacked defense counsel. See United States v. Burse, 531 F.2d 1151, 1154 (2d Cir.1976) (conviction reversed where prosecutor's misconduct included, inter alia, derogatory comments about defense counsel). The comments in question included remarks that Moloney's defense was "hog wash" and that defense counsel had created a "smoke screen." The prosecutor also urged members of the jury to ask themselves whether defense counsel was trying to "confuse" them or "lead them astray." Moloney argues that such comments "conveyed to the jury a fundamental misconception of the role of defense counsel." United States v. Friedman, 909 F.2d 705, 709 (2d Cir.1990). We disagree. The comments were mildly inappropriate, if that, and clearly do not rise to the level of severity sufficient to require reversal. Compare id. (reversing conviction where prosecutor stated that "while some people ... go out and investigate drug dealers and prosecute drug dealers and try to see them brought to justice, there are others who defend them, try to get them off, perhaps even for high fees") (internal quotation marks omitted).
 
 
 20
 Moloney's final claim of misconduct is that the government impermissibly shifted the burden of proof to the defendant. In his rebuttal, the prosecutor questioned Moloney's defense by asking the jury to consider whether there was evidence to support the defense theory. The prosecutor asked: "What evidence did [the defense] offer you?" Moloney's attorney objected to this phraseology, and Judge Larimer immediately instructed the jury that the burden of proof remains at all times with the government. Even if the prosecution's remark was inappropriate--hardly a self-evident proposition--it was of little significance and was instantly cured by the district court. It did not, therefore, "substantially prejudice" Moloney. See United States v. Cruz, 797 F.2d 90, 93 n. 1 (2d Cir.1986) (statement by prosecutor that "defense ... has to convince you" is insufficient to warrant reversal where court continually reminded jury that burden remained with the government at all times).
 
 
 21
 Even considering the totality of Moloney's challenges to the government's summation, it does not establish the level of misconduct requiring reversal. Compare Floyd v. Meachum, 907 F.2d 347, 353 (2d Cir.1990) (granting habeas relief for "repeated and escalating prosecutorial misconduct from initial to closing summation"); Friedman, 909 F.2d at 709 (reversing conviction where prosecutor lambasted defense bar for representing drug dealers); Burse, 531 F.2d at 1154-55 (new trial ordered where prosecutor, inter alia, claimed to "know" certain testimony was true, incorrectly recapped trial testimony, implied that defense attorney manipulated his witnesses, and commented on high incidence of bank robbery, leaving open inference that general trend was evidence of defendant's guilt).
 
 5. Sufficiency of the Evidence
 
 22
 Moloney further claims that the evidence was legally insufficient to prove the existence of the single conspiracy charged in the indictment. To succeed, a challenge to the sufficiency of the evidence must satisfy demanding criteria. See United States v. Casamento, 887 F.2d 1141, 1156 (2d Cir.1989), cert. denied, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). We review the evidence in the light most favorable to the government, United States v. Amato, 15 F.3d 230, 235 (2d Cir.1994), drawing all inferences and resolving all issues of credibility in its favor, United States v. Khan, 787 F.2d 28, 34 (2d Cir.1986). We must uphold Moloney's conviction if a rational trier of fact could have concluded beyond a reasonable doubt that the scope of the criminal enterprise proven at trial matches the single conspiracy alleged in the indictment and that the defendant participated in the alleged enterprise with consciousness of its general nature and extent. United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1192 (2d Cir.), cert. denied, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989).
 
 
 23
 Moloney argues that the proof showed the existence of multiple conspiracies. However, "a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation." United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir.1990), cert. denied, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991). The robbery of the Brinks facility and the possession of the proceeds could reasonably have been found by a jury to be part of a single conspiracy. Cf. United States v. Potamitis, 739 F.2d 784, 788 (2d Cir.) (armed robbery and concealment of proceeds are part of the same conspiracy), cert. denied, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984). Moloney also notes that the government produced no evidence that he knew the individuals who committed the robbery. This lack of proof is irrelevant. The government need not prove that each member of a conspiracy "knew every other member or was aware of all acts committed in furtherance of [the conspiracy]" in order to demonstrate a defendant's consciousness of the general nature and extent of the enterprise. United States v. Alessi, 638 F.2d 466, 473 (2d Cir.1980). The lack of direct evidence that Moloney knew the individuals who actually executed the Brinks robbery, therefore, does not undermine the verdict.
 
 6. Supplemental Jury Instructions
 
 24
 Moloney claims that the district court's supplemental jury instructions amounted to a constructive amendment of, or a prejudicial variance from, the superseding indictment. In response to a question from the jury, Judge Larimer instructed that the overt act charged in the indictment--the Brinks robbery--could have been committed either by named defendants or by "others unknown." Because none of the named defendants was convicted of the overt act--there was insufficient evidence that Millar or McCormick committed the robbery and O'Connor was acquitted--Moloney argues that the instruction permitted the jury to speculate about, and convict Moloney of, one of a number of conspiracies other than the conspiracy alleged in the indictment. Moloney further contends that the instruction excused the government from proving that an overt act in furtherance of the conspiracy was committed in the Western District of New York.
 
 
 25
 We disagree. We have held that superficially inconsistent conspiracy determinations in the same proceedings are permissible where there is evidence that the defendant conspired with "others unknown," so long as the indictment actually mentions "others". See United States v. Rodriguez, 983 F.2d 455, 459 (2d Cir.1993). The indictment charged four named defendants and "others unknown" with the commission of the Brinks robbery. Thus, even though none of the four named defendants was convicted of the overt act, Moloney's conviction on the conspiracy count may still stand. Moreover, whether or not Moloney conspired with a named defendant or with "others unknown" to receive the proceeds of the robbery, the overt act nevertheless took place in the Western District and venue was proper.
 
 7. Denial of Downward Departure
 
 26
 Moloney further argues that Judge Larimer erroneously refused to grant a downward departure for Moloney's charitable works and public service. We lack jurisdiction to consider this claim. "A district court's refusal to depart downward is not appealable unless the guidelines were misapplied, the court misapprehended its authority or imposed an illegal sentence." United States v. Monk, 15 F.3d 25, 28 (2d Cir.1994) (citation omitted). Moloney contends that the district court misapprehended its power to depart downwardly. We again disagree. The record clearly reflects that the district court recognized its authority to depart but elected not to do so, noting that: (i) the Sentencing Guidelines "actually instruct ... that generally civic, charitable, public service of prior good works are not ordinarily relevant in determining" the sentence, (ii) the conduct allegedly meriting a downward departure would have to be "extraordinary," and (iii) Moloney had benefits that few defendants have, including education, respect in his work, skills of advocacy, intelligence, and the calling to serve as a priest. Because the court clearly did not misapprehend its authority to depart, its decision not to depart is unreviewable.
 
 8. Enhancement of Sentence
 
 27
 Finally, Moloney claims that the district court improperly applied the Sentencing Guidelines to enhance his sentence on the ground that he derived more than 1 million dollars in proceeds from the Brinks robbery. The applicable guideline provides for a four-level sentencing increase if the offense "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense." U.S.S.G. § 2B1.1(b)(7)(B).
 
 
 28
 Moloney contends that he meets neither prong of this test. First, he claims that the theft of some 7.4 million dollars from the Brinks depot did not "affect a financial institution" because the banks to which Brinks was to transfer the money were insured against the loss. The government correctly observes that Moloney's interpretation of the guideline would lead to the absurd conclusion that no enhancement could be ordered whenever the financial institution's loss was made up by a third party. Each bank suffered a loss of the money stolen and was thus "affected." That provision for reimbursement had been made does not negate the existence of the loss. "As with statutory language, the plain and unambiguous language of the Sentencing Guidelines affords the best recourse for their proper interpretation," United States v. Wong, 3 F.3d 667, 670 (3d Cir.1993), and the theft of a bank's money plainly and unambiguously "affects" it.
 
 
 29
 However, Moloney's contention that he did not derive more than $1,000,000 in gross receipts from the offense raises questions that were not resolved by the district court. Application Note 11 to Guideline § 2B1.1 provides in part:
 
 
 30
 "The defendant derived more than $1,000,000 in gross receipts from the offense," as used in subsection (b)(7)(B), generally means that the gross receipts to the defendant individually, rather than to all participants, exceeded $1,000,000.
 
 
 31
 U.S.S.G. § 2B1.1(b)(7)(B), comment. (n. 11). The PSR recommended that the sentencing court apply the enhancement under this Guideline because Moloney and his co-defendant, Millar, either "jointly or independently" possessed proceeds from the offense in the amount of 2.2 million dollars--the total sum found at Apartment 10D and Moloney's apartment. The district court adopted the findings of the PSR and concluded that Moloney "had access to and therefore derived 2.2 million dollars of proceeds." However, the district court did not find that Moloney individually derived more than $1,000,000 dollars in proceeds as contemplated by Application Note 11. Testimony at the trial reflected that: (i) Moloney possessed $168,000 in his apartment; (ii) a suitcase in Apartment 10D bearing Moloney's name and address contained $849,000; and (iii) Moloney had full access to Apartment 10D and the locked closet inside, containing some 2.1 million dollars. A finding that Moloney individually received in excess of 1 million dollars could be based on the amounts found in Moloney's apartment and in the suitcase bearing his name, but the district court made no explicit finding in that regard.
 
 
 32
 We therefore remand to the district court for factual findings to establish the amount of gross receipts Moloney derived individually--not jointly--from the offense and for resentencing, if appropriate, under the Guidelines. With regard to Moloney's other claims, the conviction and sentence are affirmed, except for the challenge to the failure to depart downward, which is dismissed for lack of jurisdiction.
 
 
 
 [1]
 This is the applicable sentencing guideline section under the 1993 United States Sentencing Guidelines in effect at the time of Moloney's trial and sentencing. As renumbered under the 1995 Sentencing Guidelines, the applicable section is U.S.S.G. § 2B1.1(b)(6)(B). The content is unchanged