UNITED STATES of America, Plaintiff,

v.

Patrick MOLONEY, Defendant.

No. 93–CR–292L.

United States District Court,
W.D. New York.

Dec. 8, 1997.

Christopher A. Buscaglia, U.S. Atty's Office, Buffalo, NY, for U.S.

Steven M. Cohen, Lorenzo & Cohen, Buffalo, NY, Stanley L. Cohen, New York City, Jonathan Feldman, William Clauss, Federal Public Defender, Rochester, NY, for Defendant Patrick Moloney.

## DECISION AND ORDER

LARIMER, Chief Judge.

## INTRODUCTION

On November 28, 1994, defendant, Patrick Moloney, was convicted at a jury trial of conspiracy to possess money that had been stolen in a robbery at a Brinks depot in Rochester, New York, in violation of 18 U.S.C. §§ 371, 2113(c). The Court of Appeals affirmed his conviction on April 1, 1996.

*United States v. Millar,* 79 F.3d 338 (2d Cir.1996).[1] On July 28, 1997, Moloney filed a motion under Rule 41(e) of the Federal Rules of Criminal Procedure for an order directing the Government to return money and other property that was seized from him in connection with the investigation and prosecution of this case.

The Government has agreed to return all of the property at issue,[2] but declines to turn over $183,300 in currency ("the money") seized from Moloney's residence on East Ninth Street in New York City on November 12, 1993. On that day, investigators searched both Moloney's residence and an apartment ("the apartment") that Moloney had subleased at 330 First Avenue in Manhattan. The investigators found over $2 million in a locked bedroom closet in the apartment. By examining the serial numbers of those bills, they were able to identify $107,-980 of that money as having been stolen in the Brinks robbery in Rochester. The agents also found a suitcase in the apartment with Moloney's then-current address and telephone number. The suitcase contained $849,000.

When they searched Moloney's residence, the investigators found a locked safe inside his closet. The safe contained $168,000 in cash. Some of the bills bore written numerical figures similar to figures found on pieces of paper in the apartment. The rest of the $183,300 that Moloney seeks here was located elsewhere in his residence.

Upon an application by Brinks, I issued an order on March 14, 1995, directing the Government to turn over $2 million of the money seized at the apartment to Brinks, the victim of the robbery. The Government contends, however, that all the money seized at both Moloney's residence and at the apartment

---

1. The Court of Appeals did remand the case for the limited purpose of making a finding whether Moloney individually derived more than $1,000,-000 in gross receipts from the offense so as to support my prior enhancement of his sentence under § 2B1.1(b)(7)(B) of the United States Sentencing Guidelines. In a Decision and Order entered on November 13, 1996, I found that the enhancement was proper and that Moloney's sentence should remain the same. The Court of Appeals affirmed that judgment in an unpub-lished decision. *United States v. Millar,* No. 96–1764, 108 F.3d 1370 (table), 1997 WL 138417 (2d Cir. Mar.24, 1997). Familiarity with those decisions is assumed.

2. In its response to Moloney's motion, the Government states that it will return all of the seized property other than the cash. On that basis, I will deny Moloney's motion with respect to those items as moot.

was stolen from Brinks and, therefore, it has turned over to Brinks the money seized from Moloney's residence as well, prior to the filing of Moloney's present motion.[3]

## DISCUSSION

### I. Procedural Issues

Before turning to the merits of Moloney's motion, there are several procedural matters that must be addressed. These include the nature of Moloney's application, the applicable statute of limitations, and the burden of proof.

Moloney filed this motion two years and eight months after his conviction, and nearly sixteen months after his conviction was affirmed by the Court of Appeals. Because Moloney filed the motion after termination of his criminal case, I must treat it as a civil complaint. *Toure v. United States*, 24 F.3d 444, 445 (2d Cir.1994); *Onwubiko v. United States*, 969 F.2d 1392, 1396–97 (2d Cir.1992).

The case law is not uniform with respect to the precise nature of such an action, however. Courts have construed such claims as arising under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, and 28 U.S.C. § 1331 (federal question jurisdiction). *Boero v. Drug Enforcement Admin.*, 111 F.3d 301, 305 n. 4 (2d Cir.1997) (collecting cases). It is clear, however, that the court does have jurisdiction to hear such a claim.

Both sides agree that the applicable statute of limitations is the six-year period for civil actions commenced against the United States as set forth in 28 U.S.C. § 2401(a). Since the earliest date on which Moloney's claim could have accrued was November 12, 1993, the date on which the money was seized, his action is timely.[4]

The fact that the Government has turned the money over to Brinks does not render Moloney's claim moot. The court's equitable powers permit an award of damages if the court finds that the seized property should have been returned to the claimant, rather than to another. *Soviero v. United States*, 967 F.2d 791, 793 (2d Cir.1992); *Mora v. United States*, 955 F.2d 156, 159 (2d Cir. 1992).

The parties dispute which side has the burden of proof. Moloney contends that he must first make out a *prima facie* case of entitlement to the property (which he asserts he has done by virtue of the fact that the money was seized from his residence), and that the burden then shifts to the Government to prove by a preponderance of the evidence that it (or in this case Brinks) has a greater claim of entitlement to the property than Moloney does.

The Government, relying on cases involving forfeiture proceedings, maintains that it has the initial burden of showing probable cause for forfeiture. Once it has done so, the Government contends, the burden shifts to the claimant to establish by a preponderance

---

**3.** Roughly $5 million of the $7.4 million stolen in the robbery has never been recovered.

**4.** To the extent that Moloney's claim can be construed as arising under the FTCA, it appears to be untimely. Section 2401(b) of Title 28 provides that a

> tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

The only evidence Moloney has presented indicating that he has presented a claim for this

money to the Government is a copy of a letter dated July 9, 1997 from his attorney to the Government's attorney asking the Government to return all tangible items and currency seized from Moloney's residence. There is no evidence that Moloney presented a claim within two years after the money was seized, or that he received a notice of final denial of his claim.

However, since it appears that there may be alternative bases for jurisdiction that do not have a similar two-year limitations period, *see, e.g., United States v. Giraldo*, 45 F.3d 509, 511 (1st Cir.1995) (federal question jurisdiction); *Mullins v. United States*, No. 96 CIV. 0241, 1997 WL 55946 *2 (S.D.N.Y. Feb. 11, 1997) (APA), and because the record plainly demonstrates that Moloney is not entitled to the relief he seeks, I will proceed to consider the merits of his application.

that he is legally entitled to possession of the property.

After reviewing the parties' briefs and relevant case law, I find that the burden is on the Government to show by a preponderance of the evidence that it had a legitimate reason to turn the money over to Brinks and that Moloney is not entitled to damages. The case law on the subject indicates that once criminal proceedings against a person have terminated,

> [t]he person from whom the property is seized is presumed to have a right to its return, and the government has the burden of demonstrating that it has a legitimate reason to retain the property.... [E]ven if the seizure was lawful the government must justify its continued possession [or disposal] of the property by demonstrating that it is contraband or subject to forfeiture.

*United States v. Martinson,* 809 F.2d 1364, 1369 (9th Cir.1987) (footnotes omitted); *accord United States v. Dean,* 100 F.3d 19, 20 (5th Cir.1996) (per curiam); *Ruiz v. United States,* No. 90 C 186, 1990 WL 203118 (E.D.N.Y. Nov.23, 1990); *United States v. Farese,* No. 80 CR. 063, 1989 WL 74963 *4 (S.D.N.Y. June 26, 1989); *Pirofsky v. United States,* 671 F.Supp. 934, 935–36 (N.D.N.Y. 1987).

## II. The Merits of Moloney's Application

■ Assuming *arguendo* that Moloney's prior possession of the money is sufficient to make out his *prima facie* showing of entitlement, I find that the Government has more than met its burden of showing, by a preponderance of the evidence, that the money was stolen from Brinks and that Moloney is not entitled to its return or to damages.

First, the very nature of the way in which the money was stored suggests its illicit character. There is simply no rational, *legitimate* reason to hold onto such a substantial sum of cash. Even an investment of the money with a modest five percent rate of return would have yielded over $9000 a year in interest. The fact that Moloney chose instead to keep this entire sum in a safe inside his closet strongly suggests that he knew that there was something wrongful about his possession of the money.

Other evidence introduced at trial adds further support to this conclusion. For example, there was evidence that Moloney traveled back and forth between his residence and the apartment. Agents of the Federal Bureau of Investigation seized $2.2 million from the apartment, $107,980 of which was later positively identified as stolen Brinks money. A suitcase in the apartment that contained several hundred thousand dollars was labeled as Moloney's property, and listed his New York City address, where the money at issue was recovered, and his telephone number.

In addition, on some occasions Moloney was seen leaving the apartment carrying bags or other containers, and that he returned to his East Ninth Street residence. There was also testimony that on one occasion he was seen by a detective counting a stack of bills in his car after he had left the apartment.

Some of the bills found in Moloney's residence also had figures written on them in ink, which were similar to figures on some of the bills found at the apartment. A forensic evaluation of the chemical composition of that ink showed the ink to be consistent with the ink contained in two pens that were found at the apartment. The ink also matched notations that were found on pieces of paper at the apartment.

From all this evidence, a reasonable inference certainly could be drawn that Moloney sometimes moved stolen Brinks money from the apartment to his residence. Given his clearly established access to and control over the money in the apartment, the most logical inference that can be drawn from his possession of $183,300 at his residence is that the money in both places emanated from the same source.

Some of my findings and rulings in connection with the trial and sentencing, and the guilty verdict itself, also support this conclusion. My admission at trial of evidence about the money seized at Moloney's residence indicates my belief that the evidence was relevant and probative as to whether

Moloney had conspired to possess stolen Brinks money. Moreover, the indictment alleged Moloney's possession of approximately $168,000 in cash at his residence as one of the overt acts in furtherance of the conspiracy. In charging the jury on the overt-act element of the offense, I read to the jury all of the overt acts alleged in the indictment, including Moloney's possession of $168,000 at his residence. The jury was therefore entitled to find that Moloney's possession of this money was an overt act in furtherance of the conspiracy to possess stolen money, and thus by implication that the money was stolen. *See Dean,* 100 F.3d 19, 21 (since Government offered into evidence at trial both $6636 removed from defendant's pocket at time of his arrest and $41,000 found in his car, trial judge was entitled to view jury's guilty verdict as an implicit acceptance of the Government's theory that all of the money constituted proceeds from bank robbery).

In a Decision and Order entered on November 13, 1996, I also expressly found that Moloney's possession of $183,300 at his residence was "direct evidence," when considered with other evidence, that Moloney individually derived at least $1 million from the robbery so as to justify an upward enhancement of his sentence under § 2B1.1(b)(7)(B) of the United States Sentencing Guidelines. I stated that "[i]n view of Moloney's lifestyle and vocation of ministering to the poor, such a large cache is significant." Decision and Order at 9.

That Decision and Order was rendered after a prior remand by the Court of Appeals directing this court to make factual findings in that regard. In that decision, the Second Circuit stated that a "finding that Moloney individually received in excess of 1 million dollars could be based on *the amounts found in Moloney's apartment* [on East Ninth Street] and in the suitcase bearing his name

..." *Millar,* 79 F.3d at 346 (emphasis added).[5] The Court of Appeals thus believed that I could justifiably find that the money at Moloney's residence was Brinks money, thus justifying the sentencing enhancement. As noted above, on remand I calculated the money found at Moloney's apartment as part of the total derived by Moloney for purposes of the enhancement. Regardless of whether my finding to that effect should be given any preclusive effect here, I reaffirm that finding now.[6]

In contrast to the substantial body of evidence supporting the Government's position, the showing made by Moloney is paltry. In fact, Moloney relies almost entirely on the presumption of entitlement arising from his prior possession of the money. His papers vaguely suggest that there may have been legitimate sources for this money, but Moloney himself has not submitted any affidavit explaining where the money came from, nor has he requested an evidentiary hearing on any of these matters. Although he has submitted an affidavit of his attorney, that is entitled to no weight with respect to matters not within the attorney's personal knowledge. *Wyler v. United States,* 725 F.2d 156, 160 (2d Cir.1983). Since Moloney has already been convicted of conspiracy to possess stolen money, he can no longer claim any Fifth Amendment privilege in that regard, and he offers no explanation for his silence.

Though I recognize that the Government has the burden of proof, the paucity of Moloney's own evidence, when measured against the substantial evidence that the money was proceeds of the Brinks robbery, demonstrates conclusively that the Government has met its burden. *See Maez,* 915 F.2d at 1469 (defendant's reliance on presumption from his possession and his offer of proof that he did odd jobs for which he was paid in cash

---

**5.** It is clear from the Second Circuit's decision that it used the term "Moloney's apartment" to refer to his residence, not to the apartment on First Avenue. Earlier in the same paragraph containing the above-quoted statement, the court referred to the total amount of money "found at Apartment 10D [on First Avenue] and Moloney's apartment ..." The court also noted testimony that "Moloney possessed $168,000 in his apartment ..." 79 F.3d at 346.

**6.** In addition to the cash, the Government has informed the court that it possesses $2230 in travelers checks that were seized from Moloney. For essentially the same reasons stated with respect to the money, I find by a preponderance of the evidence that these checks were purchased with stolen Brinks money, and Moloney's motion is also denied with respect to these checks.

was insufficient to defeat Government's showing that seized cash was proceeds of bank robbery).

A November 5, 1997 letter brief from Moloney's attorney states that some persons have in the past given substantial sums of money to Moloney, either to assist him in his charitable activities as a priest, or for safekeeping, and that Moloney frequently sold used items of various types that were donated to him or that he had salvaged after finding them abandoned. In support of that assertion, he has submitted copies of letters from several people—none of them in affidavit form—and one anonymous "investigative report" of an interview with an associate of Moloney, to that effect.

In the form presented, that is, in a letter from counsel, this evidence is totally unpersuasive. Moloney himself has not submitted an affidavit—under oath—as to the source of the money and none of his so-called benefactors has done so either.

All of the material submitted is hearsay and does not defeat the Government's strong showing. Although I am loathe to comment further on these matters, a few points do warrant some comment.

First, the amounts of money referred to in these letters, taken cumulatively, still fall far short of the $183,300 found in Moloney's residence. In addition, the investigative report, which is dated July 21, 1994, states that the interviewee said that she had given Moloney $20,000 that she had received in a settlement of a personal injury lawsuit stemming from an incident ten years earlier. I can think of no logical reason why Moloney would have simply put the entire $20,000 in his closet and kept it there for years.

Likewise, no logical inference supporting Moloney's claim can be drawn from a February 2, 1995 letter from one Aloysius Mathews in Ireland to Moloney's then-attorney stating that at some point in the past he had given Moloney $35,000 in cash to hold in Moloney's "informal credit union." The letter goes on to state that "[t]he reason this money was intrusted in Fr Pat's care was because we knew he would invest it wisely for our children's future education." If that were the

understanding between Mathews and Moloney, it would hardly make sense, much less amount to a wise investment, to lock the money away in a safe. Moloney was certainly capable of depositing the money into an interest-bearing bank account or otherwise investing it.

■ Moloney notes that although Brinks previously sought the return of the $2 million in cash seized at the apartment, that application did not seek the return of the money seized at Moloney's residence. Brinks, however, never *disclaimed* ownership of the money at issue here, and it would be speculative to read such a disclaimer into its silence. At any rate, it is clear that the Government may assert Brinks' interest in this regard. *See United States v. Maez*, 915 F.2d 1466, 1468 (10th Cir.1990) (court had "no problem in finding that the Government has sufficient interest in returning property in its possession to the true owner to sustain its participation in the [Rule 41(e)] proceedings, asserting the bank's ownership" of seized money, notwithstanding fact that bank itself did not contest defendant's ownership), *cert. denied*, 498 U.S. 1104, 111 S.Ct. 1005, 112 L.Ed.2d 1087 (1991). The Government has consistently taken the position that all of the money seized was Brinks money, and it is not precluded from doing so in opposition to Moloney's motion.

I also note that in his November 5, 1997 letter brief, Moloney contends that the money is not forfeitable to the United States under 18 U.S.C. § 981 because possession of stolen money is not among the crimes listed that will make crime-related property forfeitable. That is beside the point. The Government in this case is not seeking to have the money forfeited to it. It has already turned the money over to Brinks, the rightful owner. Moloney is not entitled to that money or to damages, since he never had any lawful right to possess the money. *See Dean*, 100 F.3d at 20–21 (affirming denial of Rule 41(e) motion to recover money that Government had released to bank's insurance carrier); *United States v. Moore*, 48 F.3d 1233, 1995 WL 87127 (10th Cir. Mar.3, 1995) (affirming denial of convicted bank robber's Rule 41(e) motion) (unreported case); *United*

*States v. Mills,* 991 F.2d 609 (9th Cir.1993) (affirming denial of Rule 41(e) motion for return of cash seized from bank robbery defendant and ordering that money be returned to bank); *Maez,* 915 F.2d at 1467 (same); *see also United States v. Wright,* 610 F.2d 930, 940–41 (D.C.Cir.1979) ("If the property is found to be contraband, then the Government need not return it at all," regardless of whether property is still needed as evidence) (footnote omitted).

## CONCLUSION

Defendant Patrick Moloney's motion for the return of property pursuant to Fed. R.Crim.P. 41(e) (Item 307) is denied.

IT IS SO ORDERED.